# BELDEN *v.* CHASE.

## ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 66. Argued November 3, 1893. — Decided December 18, 1893.

This court has jurisdiction to review the judgment of the highest court of a state in an action at common law to recover damages caused by the collision of two steamers navigating inland waters over which the United States have admiralty jurisdiction, when that judgment denies rights claimed by the plaintiff in error under rules established by statutes of the United States for preventing collisions, or rights regarding the application of such rules.

The appellate jurisdiction of this court over questions national and international in their nature, arising in an action for a maritime tort committed upon navigable waters and within admiralty jurisdiction, cannot be restrained by the mere fact that the party plaintiff has elected to pursue his common law remedy in a state court.

In an action at common law for a maritime tort, the admiralty rule of an equal division of damages in the case of a collision between two vessels, when both are guilty of faults contributing to it, does not prevail; but the general rule there is that if both vessels are culpable in respect of faults operating directly and immediately to produce the collision, neither can recover damages for injuries so caused.

A steam pleasure-yacht is an " ocean-going steamer," and is not a " coasting vessel."

A steam pleasure-yacht, on the inland waters of the United States, is bound, when under way, to carry at the foremast head a bright white light, on the starboard side a green light, and on the port side a red light, as prescribed by rule 3 in Rev. Stat. § 4233; and is not required to carry " in addition thereto a central range of two white lights," as prescribed by rule 7 of that section for " coasting steam-vessels . . . navigating the bays, lakes, rivers or other inland waters of the United States," that rule not being applicable to a steam pleasure-yacht.

Regulations established by a board of supervising inspectors, under Rev. Stat. § 4412, " to be observed by all steam-vessels in passing each other," have the force of statutory enactment; are obligatory from the time when the necessity for precaution begins; and continue so while the means and opportunity to avoid the danger remains.

Where a vessel, meeting or passing another vessel, departs from the rules laid down by the supervising inspectors and a collision results, the burden of proof is on it to show that the departure was made necessary by immediate, impending, and alarming danger.

Statement of the Case.

Where a vessel has committed a positive breach of statute, she must not only show that her fault did not probably contribute to a disaster which followed, but that it could not have done so.

Two steamers on the Hudson River at night were approaching each other head and head. One gave a short blast from its whistle to indicate an intention to pass on the port side. The other answered by a similar blast, and then gave two whistles and changed its course so as to cross the bow of the first vessel. This resulted in a collision, whereby the second vessel was sunk. An action at law was brought in a state court by the owners of the sunken vessel against the owners of the first vessel. On the trial the court was asked to instruct the jury that the pilot who first blew the sharp whistle had the right to determine the course which each was to adopt; that the answer by a single whistle was an acceptance of his determination; that it then became the duty of the second vessel to pass the other according to that determination; and that the second vessel was guilty of negligence in giving the two whistles and in changing its course. The court refused these instructions, and instructed the jury, in substance, that they were to determine whether those in management of the vessels were guilty of negligence or not, and whether they did or omitted to do that which persons of ordinary care and prudence ought to have done. *Held,*

(1) That in refusing to give the instructions asked for and in charging in this general way, the obligatory force of the rules of navigation was substantially ignored;

(2) That the instruction did not put to the jury the question whether the second vessel was justified in departing from the rules, which was error;

(3) That the jury should have been told that two vessels approaching head to head and exchanging the signal of a single whistle, were bound to pursue the course prescribed by the rules;

(4) And that they should have been further instructed that if the first vessel assented to the signal of the two whistles, and there was an error in the course, it was at the risk of the second vessel, or, at the most, both were in fault and there could be no recovery.

THIS was an action at law brought by William Donahue, owner of the steamboat Charlotte Vanderbilt, in the Supreme Court of the State of New York, against William Belden, owner of the yacht Yosemite, for so negligently navigating the yacht as to run down and sink the steamboat in the Hudson River a little north of Esopus Meadow light-house, and some ninety miles north of New York City, at or about half-past nine on the evening of July 14, 1882. Donahue died leaving a will, which was admitted to probate, and letters

testamentary duly issued thereon to Emory A. Chase and
William J. Hughes, who qualified as executors, and the action
was thereupon revived and continued in their names. There
have been three trials. Upon the first, a verdict was rendered
in favor of the plaintiffs and judgment entered thereon, which
on appeal to the general term of the Supreme Court was re-
versed and a new trial granted. *Chase* v. *Belden*, 34 Hun,
571. The case having been again tried, the trial court, pro-
ceeding in accordance with the rulings of the general term,
nonsuited the plaintiffs. This judgment was affirmed by the
general term, and upon appeal to the Court of Appeals the
judgment was reversed and the cause remanded. *Chase* v. *Bel-
den*, 104 N. Y. 86. The case was then tried a third time and
a verdict rendered in favor of the plaintiffs, and judgment
entered thereon for. $27,668.28 damages, (the value of the
Vanderbilt, with interest,) and costs, which was affirmed at
the general term. *Chase* v. *Belden*, 16 N. Y. St. Rep. 528. An
appeal was thereupon taken to the Court of Appeals and the
judgment affirmed, the record being: "Judgment affirmed
with costs. No opinion. All concur except Gray, J., who
reads for reversal, and judgment affirmed." 117 N. Y. 637.
The record here also shows this memorandum: "No prevail-
ing opinion written. See mandate at close of this opinion."
The dissenting opinion by Gray, J., is given in the record and
is reported in 27 N. Y. St. Rep. 638. To review the judgment
of the Court of Appeals this writ of error was brought.

The map on the opposite page shows the part of the river
where the collision occurred.

The Yosemite was going up and the Vanderbilt down
stream. While the latter was passing between the upper ice-
house at Big Rock Point and the lower ice-house at Knicker-
bocker wharf, she was headed for a point between Esopus
light and the shore, and the Yosemite at the same time was
headed for a point west of Rhinebeck Bluff. When opposite
the lower ice-house the Vanderbilt changed her course to the
eastward and headed for Dinsmore's house. About the same
time the Yosemite gave the signal of one whistle to the Van-
derbilt, and she answered with one whistle.

After the signals had been thus exchanged, the Vanderbilt blew two whistles and followed up this signal by such a change in her course as brought her head rapidly to the eastward until she was in a position almost directly across the stream, and was struck by the Yosemite at her forward gangway on a line nearly at right angles to her course with such force as to cut off her bow and sink her immediately.

Plaintiff alleged that the Yosemite was negligent in not having range lights; in that her red and green lights were dim; in not going to the left or the westward when the Vanderbilt gave two whistles, announcing her own intention of going to the left or to the eastward. The Yosemite claimed negligence on the part of the Vanderbilt in that when the latter was below the upper ice-house at Big Rock Point and both vessels were showing their red lights to each other, the Vanderbilt changed her course to the eastward and headed for Dinsmore's house, thus throwing herself across the path of the Yosemite; in that, when the two vessels exchanged signals of a single whistle, the Vanderbilt did not comply with the signal thus given, and go to the right, but continued her course to the left; in that the Vanderbilt, having the Yosemite on her starboard side, failed to keep out of the latter's way; in that, if the Vanderbilt was in doubt, she did not comply with the applicable rule by giving alarm whistles and slacking up her speed; in that the Vanderbilt, after complying with the signal whistle, changed her mind, blew two whistles, and took a sudden sheer to the left or eastward. It was admitted that the Yosemite did not have range lights, and in this particular the Court of Appeals held that she failed to comply with the law. It was insisted on behalf of the Yosemite that her sidelights were not dim, and that she could not go to the left when the two whistles of the Vanderbilt were heard because it was impossible for her to change her course at that moment in time to avoid the collision, and that the Vanderbilt had no right to blow the two whistles and go to the left after the interchange of signal whistles which determined that each should go to the right. There was evidence on behalf of the Vanderbilt tending to show that after she gave two whistles

the Yosemite replied with two whistles; but on behalf of the Yosemite the evidence tended to show that she did not reply with two whistles, but began to give three whistles, and the collision occurred before she could do so.

The enrolment of the Vanderbilt was issued at the port of Albany, September 25, 1880, in conformity to Title Fifty of the Revised Statutes, entitled "Regulations of Vessels in Domestic Commerce," and stated, among other things, that she was built in 1857, was two hundred and seven feet long, and measured five hundred and eighty-five and seventy-four hundredths tons. Her license was issued October 3, 1881, to be employed in the coasting trade for one year from the date thereof and no longer. Her certificate of inspection was to the effect that she was inspected in the district of Albany, July 20, 1881, and that she was permitted to navigate for one year the waters of the Hudson River between Albany and New York, touching at intermediate points, a distance of about one hundred miles, and return, or any inland route. Among the particulars of inspection were enumerated that she had one watchman and had signal lights.

The Yosemite had a license under Title Forty-eight of the Revised Statutes, entitled "Regulation of Commerce and Navigation," dated May 27, 1882, describing her as of the burden of four hundred and eighty-one and fifty one-hundredths tons, used and employed exclusively as a pleasure vessel, and designed as a model of naval architecture. She was licensed to proceed from port to port of the United States and by sea to foreign ports, without entering or clearing at the custom house, but not allowed to transport merchandise or carry passengers for pay. This license was to continue and be in force for one year from the date thereof, or until the return of the yacht from a foreign port, and no longer. Her enrolment was under Section 4319, Title Fifty, and bore date January 20, 1881, and certified that she had two decks and two masts, that her length was one hundred and eighty-two feet, her breadth twenty-three and eight-tenths feet, her depth eighteen and seven-tenths feet, and that she measured as above given. Her certificate of inspection described her tonnage and accommo-

dations and stated: "The said vessel is permitted to navigate for one year the waters of any ocean route between —— and touching at intermediate ports, a distance of —— miles and return." Among the particulars it appeared that she had one watchman, and signal lights.

The yacht was so constructed that she could be propelled by either the power of steam or sails, or by both, and at the time of the collision her sails were furled and she was propelled wholly by the power of steam. She had left City Island, eighteen miles from New York, about ten o'clock that forenoon, laid at New York until about three or four in the afternoon, and then left for Catskill.

The following are extracts from the Revised Statutes and the rules of the supervising inspectors :

## " NAVIGATION.

"SEC. 4233. The following rules for preventing collisions on the water, shall be followed in the navigation of vessels of the Navy and of the mercantile marine of the United States :

## "STEAM- AND SAIL-VESSELS.

"Rule one. Every steam-vessel which is under sail and not under steam, shall be considered a sail-vessel; and every steam vessel which is under steam, whether under sail or not, shall be considered a steam-vessel.

## " LIGHTS.

"Rule two. The lights mentioned in the following rules, and no others, shall be carried in all weathers, between sunset and sunrise.

"Rule three. All ocean-going steamers, and steamers carrying sail, shall, when under way, carry —

"(A.) At the foremast head, a bright white light, of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least five miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of twenty points of the compass, and so fixed as to throw the light ten points on each side of the vessel, namely,

from right ahead to two points abaft the beam on either side.

"(B.) On the starboard side, a green light, of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass, and so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side.

"(C.) On the port side, a red light, of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass, and so fixed as to throw the light from right ahead to two points abaft the beam on the port side.

"The green and red lights shall be fitted with inboard screens, projecting at least three feet forward from the lights, so as to prevent them from being seen across the bow.

"Rule Four. Steam-vessels, when towing other vessels, shall carry two bright white mast-head lights vertically, in addition to their side lights, so as to distinguish them from other steam-vessels. Each of these mast-head lights shall be of the same character and construction as the mast-head lights prescribed by Rule three.

"Rule Five. All steam-vessels, other than ocean-going steamers and steamers carrying sail, shall, when under way, carry on the starboard and port sides lights of the same character and construction and in the same position as are prescribed for side lights by Rule three, except in the case provided in Rule six.

"Rule six. River steamers navigating waters flowing into the Gulf of Mexico, and their tributaries, shall carry the following lights, namely : One red light on the outboard side of the port smoke-pipe, and one green light on the outboard side of the starboard smoke-pipe. Such lights shall show both forward and abeam on their respective sides.

"Rule seven. All coasting steam-vessels, and steam-vessels

other than ferry-boats and vessels otherwise expressly provided for, navigating the bays, lakes, rivers, or other inland waters of the United States, except those mentioned in Rule six, shall carry the red and green lights, as prescribed for ocean-going steamers; and, in addition thereto, a central range of two white lights; the after light being carried at an elevation of at least fifteen feet above the light at the head of the vessel. The headlight shall be so constructed as to show a good light through twenty points of the compass, namely: from right ahead to two points abaft the beam on either side of the vessel; and the after light so as to show all around the horizon. The lights for ferry-boats shall be regulated by such rules as the board of supervising inspectors of steam-vessels shall prescribe.

"Rule eight. Sail-vessels, when under way or being towed, shall carry the same lights as steam-vessels under way, with the exception of the white masthead lights, which they shall never carry.

"Rule nine. Whenever, as in case of small vessels during bad weather, the green and red lights cannot be fixed, these lights shall be kept on deck, on their respective sides of the vessel, ready for instant exhibition," etc.

"Steering and Sailing Rules.

"Rule eighteen. If two vessels under steam are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other.

"Rule nineteen. If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side, shall keep out of the way of the other."

"Rule twenty-one. Every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam-vessel shall, when in a fog, go at a moderate speed."

"Rule twenty-three. Where, by Rules seventeen, nineteen, twenty, and twenty-two, one of two vessels shall keep out

of the way, the other shall keep her course, subject to the qualifications of Rule twenty-four.

"Rule twenty-four. In construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger."

Section 4214, in Title Forty-eight, reads:

"The Secretary of the Treasury may cause yachts used and employed exclusively as pleasure vessels, and designed as models of naval architecture, if entitled to be enrolled as American vessels, to be licensed on terms which will authorize them to proceed from port to port of the United States, and by sea to foreign ports, without entering or clearing at the custom house. Such license shall be in such form as the Secretary of the Treasury may prescribe. The owner of any such vessel, before taking out such license, shall give a bond, in such form and for such amount as the Secretary of the Treasury shall prescribe, conditioned that the vessel shall not engage in any unlawful trade, nor in any way violate the revenue laws of the United States, and shall comply with the laws in all other respects. Such vessels so enrolled and licensed shall not be allowed to transport merchandize or carry passengers for pay. Such vessels shall, in all respects, except as above, be subject to the laws of the United States, and shall be liable to seizure and forfeiture for any violation of the provisions of this Title."

By section 4412 it was provided that "the board of supervising inspectors shall establish such regulations to be observed by all steam-vessels in passing each other as they shall from time to time deem necessary for safety."

Inspectors' "Rules and regulations for the government of pilots navigating seas, gulfs, lakes, bays, sounds, or rivers, except rivers flowing into the Gulf of Mexico, and their tributaries."

"Rule 1. — When steamers are approaching each other

'head and head,' or nearly so, it shall be the duty of each steamer to pass to the right, or port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give, as a signal of his intention, one short and distinct blast of his steam whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam whistle, and thereupon such steamers shall pass to the right, or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head,' or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam whistle, and they shall pass to the left, or on the starboard side, of each other.

" Note. — In the night, steamers will be considered as meeting 'head and head' so long as both the colored lights of each are in view of the other.

" Rule 2. — When steamers are approaching each other in an oblique direction (as shown in diagram of the fourth situation), they shall pass to the right of each other, as if meeting 'head and head,' or nearly so, and the signals by whistle shall be given and answered promptly as in that case specified.

"Rule 3. — If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage-way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

" Rule 6. — The signals, by the blowing of the steam whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting 'head and head,' or nearly so, but at all times when passing or meeting at a dis-

tance within half a mile of each other, and whether passing to the starboard or port."

The first seven rules of section 4233 are given, followed by diagrams illustrating the working of the system of colored lights in seven situations of meeting steamers, with observations.

*Mr. Everett P. Wheeler*, (with whom was *Mr. Lawrence Godkin* on the brief,) for plaintiff in error.

*Mr. Peter Cantine*, (with whom was *Mr. Emory A. Chase* on the brief,) for defendants in error.

I. This court has no jurisdiction. The plaintiff in error has not shown he has any right under a United States statute, which has been decided against him.

(*a*) The yacht having no colored lights that would show ahead, was not complying with the United States statutes. It was running with but one light, — the high foremast head white light, — without colored lights, that could be seen on the steamboat as the yacht was approaching her. This court cannot assume that the jury did not find that the want of these colored lights was not the cause of the collision. A general verdict will be upheld where there is evidence to sustain any finding of fact necessary to support the verdict. In the light of the issues, evidence, and verdict, the decision of the state court was not against the right, privilege, or immunity claimed under the laws of the United States, and the proceedings under the writ of error should be dismissed for want of the right to bring the case into this court, and the first assignment of error should be overruled.

(*b*) The yacht sailing on inland waters was controlled by local laws, and therefore no Federal statute was involved.

The yacht did not have the right to run on the Hudson River with a foremast head white light. The statute of New York, passed in 1826, and still contained in the Revised Statutes of that State, Title 10, Chapter 20, provides that, " whenever any steamer shall be navigating in the night time, the

master of such boat shall cause her to carry and show two good and sufficient lights, one of which shall be exposed near her bows, and the other near her stern, and the last shall be at least twenty feet above the deck." This act is still in force. No navigation law of the United States has undertaken to supersede it.

The act " fixing certain rules and regulations for preventing collisions on the water," approved April 29, 1864, 13 Stat. 58, c. 69, is the act passed by the Congress of the United States adopting the international code. It is from this act that section 4233 of the Revised Statutes is codified, embracing such acts as have been passed since then and now appearing in section 4233.

There is nothing contained in the act of 1869 requiring whistles to be given. It is made up of articles instead of rules as in section 4233, and always uses the words "steamship" or "sailing ship." The body of the act carries out what was declared as the intention of Congress as gathered from the debates on this chapter, to relate to and regulate ocean navigation, and not inland navigation.

The act of March 3, 1885, 23 Stat. 438, c. 354, entitled "An act to adopt the Revised International Regulations for Preventing Collisions at Sea," enacts "That the following revised international rules and regulations for preventing collisions at sea shall be followed in the navigation of all public and private vessels of the United States upon the high seas and in all coast waters of the United States, except such as are otherwise provided for."

. The second article in the rules provides what lights shall be carried in articles 3 to 11, both inclusive; changes the phraseology of all of them; and omits rules 5, 6, and 7 of section 4233.

The articles which correspond to certain of the rules in section 4233 are much more specific and fully stated. Article 15, which covers Rule 18, is particularly so. Article 16 is the same as Rule 19, and Article 18 is substantially the same as Rule 21. Articles 22 and 23 are in substance the same as Rules 23 and 24. This act provides for giving of whistles by Article 19,

which is the first that provides for whistles in the International Code.

Local laws are reserved and excepted from the provisions of this act. Article 25 : "Nothing in these rules shall interfere with the operation of a special rule duly made by local authority relative to the navigation of any harbor, river, or inland navigation."

Section 2 provides : "That all laws and parts of laws inconsistent with the foregoing Revised International Rules and Regulations for the navigation of all public and private vessels of the United States upon the high seas and in all coast waters of the United States are hereby repealed, except as to the navigation of such vessels within the harbors, lakes, and inland waters of the United States, and this act shall take effect and be in force from and after the first day of September, *anno Domini* 1884."

The provision contained in rule 7 of section 4233, has been continued to be used in navigation, and was not repealed by this act of 1885.

The act of August 19, 1890, 26 Stat. 320, c. 802, entitled "An act to adopt regulations for preventing collisions at sea," enacts that "the following regulations for preventing collisions at sea shall be followed by all public and private vessels of the United States upon the high seas, and in all waters connected therewith navigable by sea-going vessels."

This act is divided into Articles, and is more comprehensive and specific than the act of 1885. It provides for a foremast-head white light, and also that an additional white light may be carried forward of the foremast-head white light and lower down. That will make a central range light.

This act also reserves and excepts from its operation local laws. Article 30: "Nothing in these rules shall interfere with the operation of a special rule duly made by local authority relative to the navigation of any harbor, river, or inland water."

Section 2. "That all laws or parts of law inconsistent with the foregoing regulations for preventing collisions at sea, for the navigation of all public and private vessels of the

United States upon the high seas and in all waters con-
nected therewith navigable by sea-going vessels are hereby
repealed."

Section 3. "This act shall take effect at a time to be fixed
by the President by proclamation issued for that purpose."

Rules 5, 6, and 7 of section 4233 are omitted from this act
of 1890. The British rules, adopted in 1884, are identical
with the act of 1885, and have been adopted by nearly every
maritime power.

Why were these acts of 1885 and 1890 passed, leaving out
rules 5, 6, and 7 from section 4233 of the Revised Statutes, and
declaring in express terms, by the act of 1885, if it is only to
apply to navigation upon the high seas and in all coast waters
of the United States, except such as are otherwise provided
for? For an answer to this question the court is referred to
section 4235 of the Revised Statutes that "until further provi-
sion is made by Congress, all pilots in the bays, inlets, rivers,
harbors, and ports of the United States shall continue to be
regulated in conformity with the existing laws of the States
respectively wherein such pilots may be, or with such laws as
the States may respectively enact for the purpose."

Thus we see that this judgment rests on the construction of
the state statute of New York, and consequently this court
has no jurisdiction to review it.

II. It was gross negligence in the yacht when in the second
situation — running on a parallel line with the steamboat — to
have given one whistle. She should have given two whistles:
that would have required each vessel to have continued on
her course. If the yacht wanted to cross the bow of the
steamboat, she should have given a single whistle and procured
the assent of the steamboat, in time to have enabled the
vessels to pass in safety on a crossing course — which she did
not do.

In all cases the signals by whistle first given, must be given
in time to allow the other vessel to comply with and to pass
as desired. If not so given in time, the vessel to which it is
given is not bound by it although it may have accepted by an
answering whistle. *The Voorwarts* v. *Khedive*, 5 App. Cas.

876, 905; *The Wenona*, 19 Wall. 41, 42; *The Dexter*, 23 Wall. 69; *The Milwaukee*, Brown's Adm. 313; *The Aurania and The Republic*, 29 Fed. Rep. 98; *The Benares*, 9 P. D. 16; *The Beryl*, 9 P. D. 137, 140; *The America*, 92 U. S. 432, 437; *The Maggie J. Smith*, 123 U. S. 349, 355; *The City of New York*, 147 U. S. 72.

The yacht immediately on giving her single whistle changed her course to a crossing course in front of the bow of the steamer, without waiting for and obtaining an answer; this she had no right to do. *Chesapeake & Ohio Railway* v. *The Panama*, 46 Fed. Rep. 496; *The Hudson*, 14 Fed. Rep. 489; *The Britannia*, 34 Fed. Rep. 546.

If the single whistle which was answered as well as the two whistles which were answered were all given too late, then the yacht is in fault for having given the first whistle too late to initiate the manœuvre. The proposition made by the single whistle was a guarantee to the vessel to which it was given that it could be complied with in time. The answer to the first whistle was only an assent to be taken at the risk of the yacht, and if it could not be complied with, the responsibility remained with the yacht.

The steamboat is also free from blame under another rule that where one party suddenly puts another in jeopardy, *in extremis*, if the party so put in jeopardy uses his best judgment to avoid the collision, it is free from blame. *The Bywell Castle*, 4. P. D. 219; *The Beryl*, 9 P. D. 137; *McLaren* v. *Compagnie Française, &c.*, 9 App. Cas. 640; *The Blue Jacket*, 144 U. S. 371; *The Nacoochee*, 137 U. S. 330.

In any event, after the single whistle was given and answered it was competent for the parties to agree upon passing the other way by giving two whistles, these being answered. *Cooper* v. *Eastern Transportation Co.*, 75 N. Y. 116; (dismissed for want of jurisdiction, 99 U. S. 78); *Blanchard* v. *New Jersey Steamboat Co.*, 59 N. Y. 292.

It was also gross negligence for the yacht not to slow, stop, and back.

Rule 21 of Rev. Stat. § 4233, and Inspectors' Rule 3, each require, when the vessels have approached so near that danger

of a collision is apprehended, that each vessel shall slow, stop, and back if necessary to avoid a collision; and Inspectors' rule 3 has it, that if the vessels shall have approached within a half a mile of each other, without having come to an agreement by whistles, or have failed to understand the intention of each other, they must slow, stop, back, etc. *The City of New York,* *ubi supra.*

III. The steamboat was not guilty of contributory negligence. The yacht gave a single whistle which was heard on the steamboat; and at that instant of time changed her course to cross the bow of the steamboat; and from that time to the time of the collision, was not more than probably one-half a minute. Therefore the assumption that they were approaching each other on oblique courses must be limited to the time subsequent to the time the yacht gave the single whistle which was heard on the steamboat.

The Inspectors' rules provide for signals to be given in each of the seven situations: When the signal is given which initiates the intended movement, that this movement shall be continued until it has been finally agreed upon and shall all be completed before either vessel undertakes to make the change. If the vessels were approaching on oblique courses, to make this rule apply they must have been running on these courses before the initial movement was made; if not, then the moment the initial movement was made produced another situation and required other signals to be given in that situation, and so you will go all around the circle of the seven situations without arriving at a completion of signals required by the rules to be given under such circumstances.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

We are of opinion that the writ of error was providently allowed, and that the jurisdiction of this court is clearly maintainable.

Plaintiff in error expressly claimed the right under the statutes of the United States to navigate the Yosemite on the Hudson with a masthead light and side lights in accordance

with the statutory rules on that subject, and also the right in such navigation to the application of those rules in certain other particulars; and if these rights were denied, or either of them, the jurisdiction attached for the determination of the questions thus raised. It is of vital importance that these rules should be interpreted and enforced by the state courts in the same sense that they are in the courts of the United States. This action was for a maritime tort committed upon navigable waters and within the admiralty jurisdiction, and the appellate jurisdiction of this court over questions national and international in their nature cannot be restrained by the mere fact that the party plaintiff has elected to pursue his common law remedy in a state court.

The doctrine in admiralty of an equal division of damages in the case of a collision between two vessels when both are in fault contributing to the collision, has long prevailed in England and this country. *The Max Morris,* 137 U. S. 1. But at common law the general rule is that if both vessels are culpable in respect of faults operating directly and immediately to produce the collision, neither can recover damages for injuries so caused. *Atlee* v. *Packet Co.,* 21 Wall. 389.

In order to maintain his action, the plaintiff was obliged to establish the negligence of the defendant, and that such negligence was the sole cause of the injury, or, in other words, he could not recover, though defendant were negligent, if it appeared that his own negligence directly contributed to the result complained of.

(1) The particular fault imputed to the Yosemite was that she did not carry the range lights prescribed by Rule seven of the Rules of Navigation enacted by section 4233 of the Revised Statutes, and, this fact being admitted, it was ruled, as matter of law, that she was therefore guilty of negligence. The correctness of this ruling depends on whether, upon the true construction and application of those rules, the Yosemite came within Rule seven.

Under Rule two, the lights prescribed by the rules, and no others, are required to be carried in all weathers, between sunset and sunrise.

By Rule three, "all ocean-going steamers, and steamers carrying sail, shall, when under way, carry," at the foremast head, a bright white light; on the starboard side, a green light; on the port side, a red light; all as described.

By Rule four "steam-vessels, when towing other vessels, shall carry two bright white masthead lights vertically, in addition to their side lights," of the same character and construction as the masthead lights prescribed by Rule three.

Rule five provided: "All steam-vessels, other than ocean-going steamers and steamers carrying sail, shall, when under way, carry on the starboard and port sides lights of the same character and construction, and in the same position as are prescribed for side lights by Rule three, except in the case provided in Rule six."

Rule six related to "river steamers navigating waters flowing into the Gulf of Mexico and their tributaries," and provided that they should carry the red and green lights on their starboard and port smoke pipes instead of on their sides.

By Rule eight, sail-vessels, when under way, or being towed, must carry the same lights as steam-vessels under way, but not the white masthead lights.

By Rule nine, vessels too small to have the green and red lights fixed upon their starboard and port sides shall have them ready "for instant exhibition."

Rule seven read: "All coasting steam-vessels, and steam-vessels other than ferry-boats, and vessels otherwise expressly provided for, navigating the bays, lakes, rivers, or other inland waters of the United States, except those mentioned in Rule six, shall carry the red and green lights as prescribed for ocean-going steamers; and in addition thereto a central range of two white lights; the after light being carried at an elevation of at least fifteen feet above the light at the head of the vessel. The headlight shall be so constructed as to show a good light through twenty points of the compass, namely: from right ahead to two points abaft the beam on either side of the vessel; and the after light so as to show all around the horizon. The lights for ferry-boats shall be regulated by such rules as the board of supervising inspectors of steam-vessels shall prescribe."

The manifest object of this rule was the requisition of the range lights; but, out of abundant caution, and notwithstanding the provisions of Rule five, the mandate as to the red and green lights is repeated, and the range lights declared to be " in addition."

The importance attributed to the red and green lights is apparent throughout these rules and in the rules and regulations of the board of supervising inspectors. After diagrams are given in illustration of the working of the system of such lights, it is there said that by reference to them "it will appear evident that in any situation in which two vessels may approach each other in the dark, the colored lights will instantly indicate to both the relative course of each; that is, each will know whether the other is approaching directly or crossing the bows, either to starboard or port. This intimation, with the signals by whistle, as provided, is all that is required to enable vessels to pass each other in the darkest night with almost equal safety as in broad day."

Rule seven applied to coasting steam-vessels, and steam-vessels, other than ferry-boats and other than vessels otherwise expressly provided for, navigating inland waters, and excepting the river steamers mentioned in Rule six.

Steam-vessels not otherwise expressly provided for were those not expressly provided for in the matter of lights other than the red and green lights. Ocean-going steamers and steamers carrying sail and steam-vessels when towing other vessels were thus otherwise expressly provided for in Rules three and four. Rule five related wholly to the red and green lights, and did not expressly provide for other lights. Mississippi steamers were expressly excepted from the operation of Rule five, because, although they also carried red and green lights, these lights occupied a different position than in the instance of other steam-vessels; and Mississippi steamers were also expressly excepted from the operation of Rule seven, because under these rules they were to carry only red and green lights, and were, therefore, not otherwise expressly provided for in respect of lights other than the red and green lights. The rules were accurately drawn, and should not be

deprived of their obvious application by refined construction.

To repeat: Ferry-boat lights were to be regulated by the board of supervising inspectors; all steam-vessels were to carry red and green lights, but differently placed on river steamers navigating the waters flowing into the Gulf of Mexico; coasting steam-vessels and steam-vessels engaged in inland navigation were governed by Rule seven; and vessels otherwise expressly provided for by the provisions thus made. And it was expressly provided that, in addition to the green and red lights, steam-vessels when towing other vessels should carry two bright white masthead lights vertically, and ocean-going steamers and steamers carrying sail should carry, when under way, at the foremast head, a bright white light, and no others.

It may be added that range lights were originally required by the statute of New York of 1826. Laws N. Y. 1826, c. 222, p. 253. Side lights were not then provided for, and there were practically no ocean-going steamers. When colored lights were introduced and changed conditions obtained, new rules became necessary and were adopted.

As to ocean-going steamers and steamers carrying sail, the bright white light required at the foremast head was to be "so constructed as to show a uniform and unbroken light over an arc of the horizon of twenty points of the compass," while as to coasting steamers, of the central range of two white lights prescribed, the after light was to be "at least fifteen feet above the light at the head of the vessel," and "to show all around the horizon."

The argument that by reason of the difference between the two classes, the lights required as to one class would be impracticable in respect of the other, is not without force, and indeed, on April 9, 1887, the Secretary of the Treasury approved the conclusion of the Supervising Inspector-General, that "the central range lights provided in Rule seven, Section 4233, Revised Statutes, are never to be used on ocean steamers, as the white light aft required by that rule would be obscured by the masts, yards, and rigging of such a steamer, and therefore useless." Treas. Dec. 1887, p. 200, No. 8168.

The Yosemite was an "ocean-going steamer." She was constructed for and adapted to ocean navigation, had been upon the ocean, and had just been authorized "to navigate for one year the waters of any ocean route." She was also a "steamer carrying sail." She was none the less "ocean-going" because not at the time on the ocean, and none the less "carrying sail" because she was not at the time under sail. These terms were merely descriptive of her characteristics, and not of her situation. She was "under way," which words, in Rule three, would be superfluous if she must be traversing the ocean in order to be "ocean-going," and have her sails set in order to be "carrying sail;" and she was "under steam" and therefore not governed by the rules applicable to a steamer solely "under sail," by Rule one, a rule demonstrating that "under sail" and "carrying sail" were not used as synonymous terms.

In our judgment, the lights she was required to carry were expressly provided for in Rule three, and these lights she had.

The decision of the Court of Appeals that the Yosemite was bound to carry "a central range of two white lights," as prescribed in Rule seven, was based upon the ground that she was "in legal character and by nomenclature 'a coasting steam-vessel;'" and that, even if this might "not be absolutely true of the Yosemite in all situations, it was nevertheless true of her when navigating inland waters."

By the first section of the act of Congress of August 7, 1848, 9 Stat. 274, c. 141, the Secretary of the Treasury was authorized to cause yachts used and employed exclusively as vessels of pleasure, to be enrolled and licensed as vessels which were not required to qualify at the custom house; and this act was amended by that of June 29, 1870, 16 Stat. 170, c. 170, by inserting after the words "port to port of the United States" the words "and by sea to foreign ports," and as thus amended was carried forward into section 4214 of the Revised Statutes.

The Court of Appeals was of opinion that yachts licensed under the statute of 1848 were exclusively coasting vessels, and that, as by the act of 1870, they might be permitted to

proceed by sea to foreign ports, they thus might have a double character, that is, of coasting vessels and vessels entitled to go upon the seas to foreign ports. Reference was made to the fact that the Yosemite was enrolled at the port of New York in conformity to Title Fifty of the Revised Statutes, entitled "Regulation of Vessels in Domestic Commerce," and was also licensed in pursuance of chapter two, Title Forty-eight, entitled "Regulations of Commerce and Navigation." And it was said that Title Fifty related exclusively to coasting and fishing vessels, while Title Forty-nine was entitled "Regulations of Vessels in Foreign Commerce." The conclusion was then announced that the Yosemite, being enrolled under the statute relating to coasting vessels, and her license being a coasting license, with the added privilege of being allowed to proceed to foreign ports, it did not seem to allow of reasonable doubt that the Yosemite while navigating the Hudson River was navigating under her license in the character of a coasting vessel.

We are unable to accept this conclusion. While Title Fifty is entitled by way of convenience "Regulation of Vessels in Domestic Commerce," there are many provisions contained under that title relating to vessels engaged in foreign commerce, and among them sections 4322 and 4323, which enable the owner of a coasting vessel to surrender his enrolment and register his vessel, or to surrender his register and take out an enrolment.

The register declares the nationality of a vessel engaged in foreign trade, the enrolment, the national character of a vessel engaged in the home traffic and enables her to procure a coasting license. By section 4318, under the same title, vessels navigating the waters of the northern, northeastern, and northwestern frontiers, otherwise than by sea, may be enrolled and licensed in such form as other vessels, and need not take out a certificate of registry. *The Mohawk*, 3 Wall. 566.

Ordinarily the terms "coaster" and "coasting vessel" are applied to vessels plying exclusively between domestic ports, and usually to those engaged in domestic trade as distinguished from vessels engaged in the foreign trade or plying between a

port of the United States and a port of a foreign country. *Gibbons* v. *Ogden*, 9 Wheat. 1.

The mere fact that an ocean-going steamer may touch at some other port of the United States, after leaving her port of departure, would not make her a coaster, and this is recognized by section 4337, which is another of the sections included in Title Fifty worthy of notice.

Pleasure-yachts, designed as models of naval architecture, are not coasters in any statutory sense, for they are not allowed to transport merchandise or carry passengers for pay, and we do not think it reasonable to construe the words of the statute applicable to coasters as applicable to them in view of their character and the legislation upon the subject taken together.

As we have remarked, vessels engaged in domestic commerce may be transferred to the class of vessels authorized to sail to foreign ports by a change from an enrolment to a register; but, in the case of yachts, the statute provides that when entitled to be enrolled as American vessels, they may be authorized to proceed from port to port of the United States, and also by sea to foreign ports, so that, by a simple license, being mere pleasure-boats, not authorized to transact business, they may sail to either, but their essential character as ocean-going steamers, if they are such, remains the same, whether they are actually navigating from port to port of this country or to ports abroad.

The Yosemite was enrolled in 1881, and in May, 1882, took out the license which authorized her to proceed by sea to foreign ports and also from port to port in the United States. The privilege of doing both was granted, and her license no more authorized her to proceed to domestic ports, with the added privilege of going to foreign ports, than to proceed to foreign ports with the added privilege of navigating between domestic ports. She could do both, and to enable yachts to do so was the design and express language of the statute.

We have not deemed it necessary to discuss the supposed bearing of the act of February 28, 1871, 16 Stat. 440, 454, c.

100, referred to by defendant in error, or the acts of 1864, 13 Stat. 58, c. 69, and of 1866, 14 Stat. 227, c. 234, as substantially the same question would arise under those acts, and the obscurity, if any, is not in the revised law.

Nor have we felt called upon to refer to the acts of March 3, 1885, 23 Stat. 438, c. 354, or that of August 19, 1890, 26 Stat. 320, c. 802, as this collision occurred in 1882.

We hold that Rule seven was not applicable to the Yosemite, and that therefore the Court of Appeals erred in affirming the judgment of the Supreme Court, which approved the instruction of the learned trial judge, (to which exception was duly saved,) that "the Yosemite, upon that occasion, was bound to have those lights which I have described to you as central range lights, and the absence of those statutory signals was, upon her part, negligence."

(2) In addition to the rules for preventing collisions, prescribed by section 4233, it was provided by section 4412 that "the board of supervising inspectors shall establish such regulations to be observed by all steam-vessels in passing each other, as they shall from time to time deem necessary for safety." The rules laid down by the latter as thus authorized have the force of statutory enactment, and their construction, (when put in evidence as they were in this case,) as well as that of the rules under section 4233, is for the court, whose duty it is to apply them as matter of law upon the facts of a given case. They are not mere prudential regulations, but binding enactments, obligatory from the time that the necessity for precaution begins, and continuing so long as the means and opportunity to avoid the danger remains. *The Dexter*, 23 Wall. 69. Obviously they must be rigorously enforced in order to attain the object for which they were framed, which could not be secured if the masters of vessels were permitted to indulge their discretion in respect of obeying or departing from them. Nevertheless it is true that there may be extreme cases where departure from their requirements is rendered necessary to avoid impending peril, but only to the extent that such danger demands. *The John L. Hasbrouck*, 93 U. S. 405; *The Sunnyside*, 91 U. S. 208; *The*

*Johnson,* 9 Wall. 146; *The City of Washington,* 92 U. S. 31; *The Voorwarts & Khedive,* 5 App. Cas. 876; *The Byfoged Christensen,* 4 App. Cas. 669.

And while under Rule twenty-four, in construing and obeying the rules, due regard must be had to all dangers of navigation and to any special circumstances which may exist in any particular case, rendering a departure from them necessary in order to avoid immediate danger, the burden of proof lies on the party alleging that he was justified in such departure. *The Agra,* L. R. 1 P. C. 501; *The General Lee,* Irish L. R. 3 Eq. 155. Indeed, in *The Agra,* it was ruled that not only must it be shown that the departure at the time it took place was necessary in order to avoid immediate danger, but also that the course adopted was reasonably calculated to avoid that danger. And it is the settled rule in this court that when a vessel has committed a positive breach of statute, she must show not only that probably her fault did not contribute to the disaster, but that it could not have done so. *The Pennsylvania,* 19 Wall. 125, 136; *Richelieu Navigation Co.* v. *Boston Ins. Co.,* 136 U. S. 408, 422.

Obedience to the rules is not a fault even if a different course would have prevented the collision, and the necessity must be clear and the emergency sudden and alarming before the act of disobedience can be excused. Masters are bound to obey the rules and entitled to rely on the assumption that they will be obeyed, and should not be encouraged to treat the exceptions as subjects of solicitude rather than the rules. *The Oregon,* 18 How. 570.

By Rule nineteen, " if two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

By the eighteenth, if two vessels under steam are meeting end on or nearly end on, so as to involve risk of collision, the helms of both must be put to port so that each may pass on the port side of the other.

This is repeated in Rule 1 of the inspectors' rules, and it is provided not only that when steamers are thus approaching

each other, it shall be the duty of each to pass to the right, or port side of the other, but that the pilot of either may be first in determining to pursue this course, and thereupon shall give as a signal of his intention one short and distinct blast of his whistle, which the pilot of the other vessel shall answer by a similar blast, and thereupon said steamers shall pass to the port side of each other.

By Rule 2, when steamers are approaching each other in an oblique direction, (as shown in fourth situation,) they shall pass to the right of each other as if meeting "head and head," or nearly so, and the signals by whistles shall be given and answered promptly as in that case specified.

By Rule 3, if, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot, if in doubt, shall immediately signify the same by giving several short and rapid blasts of the steam whistle, and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed until the proper signals are given, answered, or understood, and until the vessels shall have passed.

It seems to us that these rules were strictly applicable, and were disregarded by the Vanderbilt. When the plaintiff rested, the defendant moved to dismiss, which was overruled, and it is contended here that on the plaintiff's own showing the Vanderbilt was palpably guilty of negligence which contributed directly to produce the collision, and hence that that motion should have been sustained; but we do not care to pass upon that question, and content ourselves with indicating certain errors in the rulings of the trial court, which appear to us to so essentially deprive the rules of the force which should have been given them as to amount to a decision against rights claimed under the statute of the United States. The speed of the Yosemite was about sixteen miles, and that of the Vanderbilt nine miles, an hour, and they were approaching each other, therefore, at an aggregate speed of twenty-five miles an hour. The pilot of the Vanderbilt testified that he saw the white light of the Yosemite when he was between the ice-houses,

apparently a mile distant. The steamers were then on parallel courses. He did not see her green light at any time, but saw her red light just before or just after she blew two whistles. When he was abreast of the lower ice-house, he thought about a quarter of a mile from the place of collision, he headed her for Dinsmore's house, "way off to the eastward," and, believing that the Yosemite was a tow, laid his course more to the eastward. He was thus crossing the course of the Yosemite, which was brought on the starboard. At this point the pilot of the Yosemite gave a short and distinct blast from his whistle as required by law, as a signal of his intention to pass to the port side of the Vanderbilt, and this the pilot of the Vanderbilt answered by a similar blast; whereupon under the rules it became imperative for the steamers to pass to the port side of each other. The Vanderbilt was bound to go to the right after the bargain was made by the exchange of single whistles; but instead of doing this, and immediately after, the Vanderbilt's pilot gave two whistles, which it is claimed on behalf of the plaintiff were answered by two whistles from the yacht. This is denied by the latter; and even if true, an assent to the Vanderbilt's change was at the latter's risk. The Vanderbilt's pilot on the instant sheered his boat to port, then slowed, and the collision occurred, the Vanderbilt being struck nearly at right-angles.

Among other instructions the court was requested by the defendant below to give, were these :

" 8. As the proof is undisputed that the steamboat Vanderbilt and the yacht Yosemite were approaching each other head and head, or nearly so, the law prescribes their duties respectively in regard to blowing their whistles.

" 9. If the yacht Yosemite, as the vessels were approaching each other, blew a single whistle and the steamboat Vanderbilt answered it by a single whistle, the course which she was thereupon bound to pursue was thereupon determined and each vessel was bound to pass to its own right, that is, to the port side of each other, which would have been the Vanderbilt to the west and the yacht Yosemite to the east.

" 10. The pilot who first blew the first whistle thereby had

the right to and did determine the course which each was then to adopt.

"11. The blowing of the single whistle by the steamboat Vanderbilt after the first single whistle from the yacht Yosemite was an acceptance by the steamboat Vanderbilt of the election of the course so adopted by the yacht Yosemite, and it then became the duty of the steamboat Vanderbilt to pass to the port or western side of the Yosemite."

"14. Even if the Vanderbilt, after having by one whistle accepted the one whistle of the yacht, had a right to change the conditions and course by a blast of two whistles, yet unless these two whistles were given in time to enable the yacht to go in safety to the west of the Vanderbilt, they would tend to complicate the situation, and the Vanderbilt was in that event guilty of negligence in giving the signal of two whistles."

These instructions were refused and the defendant excepted.

The court instructed the jury on this branch of the case that it was claimed on the part of the defendant that it was negligence for the Vanderbilt to blow the two whistles and to take the rank sheer and cross the bow of the Yosemite, and on the part of the plaintiff that at the time of the two signals being given it was impracticable to carry out the agreement which had been made by the signal which had been given and accepted of the one whistle; that he was compelled to give the two signals, and believed the Yosemite accepted his proposition that each should go to the left, while on the part of the defendant it was contended that two whistles were not blown in response, but that the pilot of the Yosemite started to blow three as a signal of danger and of repudiation of the offer made by the Vanderbilt, but before he could get them out the collision occurred; and the court left it to the jury to say whether the pilot of the Vanderbilt in attempting to change his course and to cross the bows of the Yosemite was guilty of negligence which contributed to the accident. Rule 3 was treated by the court in a similar way.

In short, the learned judge instructed the jury that it was for them to determine whether those who were in the management of the respective boats were guilty of negligence or

not, and whether or not they did or omitted to do that which persons of ordinary care and prudence ought to have done; but in charging in this general way, and refusing to give the instructions above named, the obligatory force of the rules of navigation was substantially ignored.

The question whether, upon the proofs, the departure by the Vanderbilt from the rules was justified was not put to the jury, but whether upon the whole there was negligence in what was done or left undone. In this there was such error as the defendant may avail himself of in this court, so far as saved by his requests to charge.

If these two steamers were approaching each other head and head, or nearly so, or obliquely, as mentioned in Rule two, the law-prescribed their duties respectively, and the jury should have been told so; and as there was no doubt that upon the exchange of single whistles the course each was bound to pursue was determined, the instructions to that effect should have been given. And so, if the Yosemite assented to the two whistles and the Vanderbilt's course, this, if an error, was one at the risk of the Vanderbilt, and at most would be an error in which both concurred, and if both were in fault, there could be no recovery. Of course, the test as to whether the departure from the rules was excusable, if there were clear and satisfactory evidence to that effect, might have been applied through proper instructions or qualifications on that subject, but as the case stood, we think those above quoted should have been given, and that the refusal to do so, taken with the actual instructions, erroneously disposed of a Federal right.

*The judgment of the Court of Appeals is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE BROWN concurring.

While I fully concur in the opinion of the court that this case should be reversed upon the ground of the contributory negligence of the Vanderbilt, I think the Yosemite was guilty of a breach of the regulations in failing to carry the range

lights provided by Rule seven, although it may be open to doubt whether such failure contributed to the collision, in view of the gross fault on the part of the Vanderbilt.

Rule seven, upon the construction of which the question turns, requires "all coasting steam-vessels and steam-vessels other than ferry-boats and vessels otherwise expressly provided for, navigating the . . . inland waters of, the United States," to carry range lights. Were the Yosemite an ordinary coasting vessel, there could be no doubt of her obligation to be provided with these lights when navigating inland waters. She was, however, licensed under Rev. Stat. sec. 4214 as a yacht "used and employed exclusively as a pleasure-vessel, and designed as a model of naval architecture," on terms which authorized her "to proceed from port to port of the United States, and by sea to foreign ports, without entering or clearing at the custom house." She was enrolled under Rev. Stat. Title 50, which relates exclusively to coasting and fishing vessels. To put upon this statute (sec. 4214) the construction most favorable to her, it seems to me that she was invested with a double character: first, as an ocean-going steamer; and second, as a coasting vessel; and that, when navigating the inland waters of the country, she was bound to conform to the usages of those waters, and to carry the lights provided by law for "steam-vessels other than ferry-boats and vessels otherwise expressly provided for." Even admitting that ocean vessels when navigating inland waters are not bound to carry these range lights, because it is not contemplated that they shall navigate these waters, I am clearly of the opinion that yachts, which ply chiefly between ports and places within the United States and upon the inland waters of the country, should carry them. It seems to me an exceedingly dangerous practice, and one which, according to the theory of the Vanderbilt, had much to do with the collision in this case, to permit vessels not carrying the lights appropriate to inland navigation to navigate the narrow waters of the country. Vessels navigating those waters are entitled to expect that other vessels which they meet are required to carry the same lights which they carry,

and any distinction in that particular in favor of yachts is liable to create uncertainty and confusion with regard to the character of the approaching vessel. While upon the ocean, I have no doubt her obligations would be discharged by carrying the white and colored lights provided by Rule three for ocean-going steamers, but while plying upon the Hudson River, I think she was navigating under her license as a coasting vessel, and should have carried the range lights required in inland navigation.

If the case required it, I would even go further and say, as did the dissenting judge when this case was heard before the general term, (34 Hun, 571, 577,) that ocean-going steamers when navigating the inland waters of the country, and not under sail, should carry the range lights provided by Rule seven. If this be not obligatory, I find it difficult to understand to what the words "steam-vessels other than ferry-boats and vessels otherwise expressly provided for" apply. There is an exception of ferry-boats which is easy to understand. There is, also, an exception of "vessels otherwise expressly provided for," which, in the opinion of the court, applies to ocean-going steamers, which are provided for by Rule three; but in my opinion these words should be construed as if reading "steam-vessels other than ferry-boats and vessels otherwise expressly provided for *in respect to inland navigation.*" After expressly excepting ferry-boats, which are of a limited class, it seems to me a violation of the rule of *ejusdem generis* that, under the words "vessels otherwise expressly provided for" should be exempted the very large class of ocean-going steamers, and, as observed by the dissenting judge of the general term, these words are perhaps used as words of caution, either as to present or future possible provisions. I have no doubt that ocean-going steamers are not obliged to carry range lights when ascending the waters of a river as far as their customary wharves near the mouth of such river; but if such steamers were in the habit of ascending the Hudson River as far as Albany, or the Mississippi as far as St. Louis, it would be exceedingly dangerous to permit them to navigate without the customary range lights provided for those waters. But,

as before observed, it is unnecessary to place the liability of the Yosemite upon this broad ground.

MR. JUSTICE FIELD and MR. JUSTICE GRAY did not hear the argument, and took no part in the consideration and decision of this case.