# CIRCUIT COURT OF THE CITY OF NORFOLK

Richard H. Middleton

v.

Lone Star Industries, Inc.

August 30, 1976

Case No. (Law) L-73-130

By JUDGE JOHN W. WINSTON

This will constitute the Court's opinion setting forth its findings of fact and conclusions of law regarding the vessel collision that gave rise to this litigation.

On the early morning of March 15, 1969, a Pacemaker motor yacht, *Miss Padi*, being piloted by owner, Richard H. Middleton, in the navigable waters of the United States was in collision with a sand scow being pushed by the tug *Soumatco*, which at the time was being navigated by George E. Paul, her mate. The forward port corner of the scow struck the starboard side of the yacht amidships, causing damages to the yacht costing $4,594.00 to repair. No discoverable damage resulted to the scow. This mishap occurred at about 4:25 A.M. on a clear dark night, with unimpaired visibility. Both the yacht and the tug and the scows the latter was pushing were equipped with and were showing all of the navigation lights required on them by law.

Yacht *Miss Padi* was a newly delivered vessel, 60 feet long, having a beam of just under 16 feet, and a draft of around 4 feet. She was powered by twin 350 horsepower diesel engines, which were controlled by throttles on the right side of her wheel inside a glassed-in station. The yacht's maximum speed was about 16 knots.

Tug *Soumatco* was 79 feet long, single screw, had a draft of about 10 feet, was navigated from a wheelhouse up on her second deck. She had a 510 horsepower Caterpillar

engine which was controlled from the wheelhouse without the assistance of an engineer.

The unmanned sand scows being pushed by the tug were each 125 feet in length. Two scows were made up in tandem fashion directly ahead of the tug, extending forward a distance of at least 250 feet. A third scow was made up alongside and on the port side of the front scow.

The tug and scows were in Virginia waters en route from Norfolk to Curles Neck (on the James River above Hopewell) via Newport News. The yacht had earlier entered Hampton Roads and then proceeded south in the Elizabeth River towards Portsmouth. Before arriving there, the yacht was turned around in the River and then headed for her original destination, Hopewell. Thus prior to the collision both vessels were under way northbound in that portion of the Elizabeth River and Hampton Roads known as the Norfolk Harbour Reach.

That Reach runs roughly North and South, is 1500 feet in width, and is marked by numbered buoys on each side. (See Defendant's Exhibit 4, Chart C. & G.S. 400.)

Just above Buoy R 10 and extending westward from the Reach to the Newport News Channel is a fairway designated on the chart (C. & G.S. 400) as a "Fairway For Shallow-Draft Vessels and Tows."

At a speed of about 6 knots the tug *Soumatco* pushed her scows northward on the starboard side of the Reach. Behind her at a speed of about 7-8 knots the yacht *Miss Padi* proceeded northward on the port side of the Reach. The yacht stayed some 25-50 feet inside the port side buoys, according to Mr. Middleton, and did not change course or speed until seconds before the collision.

The tug flotilla continued northward on the starboard side of the Reach until it was almost to buoy R 12 (below Piers A and B), Mate Paul then altered the tug's course about 45 degrees to port, in order to head for a buoy over in the Newport News Channel. The tug's speed was not changed and remained as before. The only traffic in the waters astern of the tug flotilla as observed by mate Paul as he moved northward up the Reach was a white light off the Craney Island light which we took to be a Navy launch. He did not observe it further, does not know where it was when he altered course. He did not look astern before making the course change to port, did look ahead and saw oncoming Reach traffic 2-2½ miles

away. His first knowledge that the yacht *Miss Padi* was in the area astern of him came when he caught her out of the corner of his eye. The yacht was then right at the forward port corner of the lead port scow and the collision followed immediately. No signals were heard from the yacht by Paul before the collision.

With Mr. Middleton at the wheel, the yacht *Miss Padi* had slowly overtaken the tug flotilla. According to Middleton, the yacht was proceeding "maybe a third faster than he (tug) was." Middleton estimated the yacht would have overtaken and passed the tug 100-200 feet away on the port side barring any change of course. While still aft of the tug and near buoy R 12, Middleton observed her two white mast lights, knew that the tug was pushing something. He could not then determine the nature or length of the tow being pushed, did not shine his light or make any effort to find out what it consisted of. And though he knew he was overtaking the flotilla he sounded no signals as required by law to advise the tug that the yacht proposed to pass by on her port side. Instead Middleton and his passenger Poole concentrated on their chart (C. & G.S. 400) and on the numbered buoys alongside which they were running by on the port side. When Middleton first observed the tug, no red running light could be seen, a clear indication that the yacht was then more than two points abaft her beam. Middleton did not observe the course change executed by the tug, states that "Well, I wasn't looking at him that much. I got my own vessel to watch and I was watching for lights that I am following. . . Q. That was the channel markers you were watching? A. Channel markers, right. As long as I kept the tug away from me I didn't. . . I wasn't concerned with it." (Middleton depositions pages 30-31.) He does remember then being abeam of the tug, could see her red running light. His efforts and those of his passenger were at that point redirected to the chart and buoys. The Yacht was then past buoy R 12 and approaching buoy R 10. Middleton planned to go on up to buoy R 8 and then turn left to the Newport News Channel. Suddenly the tug's spotlight came on and Middleton saw for the first time the course change of the tug flotilla already in effect and the port side lead scow some 10-12 feet away and aimed for the yacht's midships. Passenger Poole was never aware of the closeness of the flotilla to the yacht until the scow collided with it. Middleton made a strenuous effort

to extricate the yacht from the perilous situation by turning her wheel hard and by giving full throttle to her engines. These efforts did not prevent the collision which then occurred within seconds, did likely prevent more serious damage to the yacht than it actually received.

The Court finds that contrary to Middleton's belief, the tug flotilla had already made its course change and was again on a steady course across the Reach when he first observed the tug's red running light abeam of him. An overtaking situation still existed. At no time prior to the collision had the yacht ever completely overtaken and safely passed by the tug flotilla. Had the yacht done so no collision would ever have occurred since she was travelling faster than the tug flotilla. And she had a slightly longer course to travel than did the yacht (because of the course change) to reach the collision point.

The Court further finds that the course change by the tug flotilla was not an unexpected one, since the yacht was well aware that this was a pushing tow proceeding upriver and that it might well turn toward Newport News or into the shallow draft vessel and tow fairway observed on the chart at buoy R 10 being approached by Mr. Middleton. He failed to signal the tug flotilla of his intention to pass, failed to maintain a proper lookout for the maneuvers of the other vessel, and failed to keep out of her way in an overtaking situation.

### Conclusions of Law

1. Though this suit was filed in a state court and not in a United States District Court, the admiralty principle of divided damages (comparative negligence) must be applied. thus, contributory negligence is not a bar to any recovery of damages resulting from a collision between steam vessels on the navigable waters of the United States, results in mitigation only. The Inland Rules (United States statutes) apply in all states. And admiralty principles must be uniformly applied to maritime collisions. The choice of a state forum by a plaintiff cannot affect the substantive law to be applied in resolving the issues presented. *Moragne* v. *States Marine Lines, Inc.,* 398 U.S. 375, 377, fn. 1 (1970); *United States* v. *Reliable Transfer Company, Inc.,* 421 U.S. 397 (1975); *Colonna Shipyard, Inc.* v. *Bland,* 150 Va. 349 (1928). But

see contra: *Union SS Company* v. *Nottingham*, 58 Va. (17 Gratt.) 5 (1866); *Belden* v. *Chase*, 150 U.S. 674 (1893).

2. The yacht *Miss Padi* committed the following statutory faults:

(1) As an overtaking vessel she failed to keep out of the way of the tug flotilla being overtaken. 33 USCA Section 209.

(2) As an overtaking vessel she failed to signal the tug flotilla ahead of her desire to pass on the port side before attempting to do so. 33 USCA § 203, Rule VIII.

(3) As an overtaking vessel she failed to keep a proper lookout for any expected course changes by the tug flotilla and to drop back and remain clear until she could proceed in safety. 33 USCA § 221.

All of these faults constituted negligence on the part of the yacht and were proximate causes of the collision that occurred.

3. The tug *Soumatco* was not guilty of any negligence which caused or contributed to the collision. The tug flotilla was at all times the overtaken vessel, since the yacht never safely overtook and passed by it. Mate Paul was never aware that the yacht was behind him (except as a far away white light down by Craney Island) or that she was in close pursuit of the tug flotilla when the course change was made. He had no duty to look to his rear before turning and, in the absence of any yacht signals, was not required to maintain his original course and speed until the passing was accomplished. His course change was not unreasonable or of an unexpected nature. Indeed, it would have been anticipated by alert and watchful personnel on board the yacht. In the absence of passing signals, as here, Paul's conduct in making his course change was in full compliance with the law. *The Industry*, 29 F.2d 29 (2d Cir. 1928); *The S. & H. No. 2*; 119 F.2d 666 (2d Cir. 1941); *Liner* v. *Crewboat Mr. Lucky*, 275 F. Supp. 230 (D.C. La. 1967); *Griffin on Collision* (1949) § 64, pages 184-187, in particular.

4. The sole cause of the collision was the negligent navigation of the yacht *Miss Padi*. There is no clear and convincing evidence that the actions of the privileged tog flotilla were in any way a contributing factor. *United States* v. *SS. Soya Atlantic*, 330 F.2d 732 (4th Cir. 1964).

Counsel are requested to present an order entering judgment for the defendant and awarding it taxable costs.