# PUGET SOUND NAV. CO. v. NELSON.

## No. 6600.

Circuit Court of Appeals, Ninth Circuit.

June 24, 1932.

H. B. Jones and Robert E. Bronson, both of Seattle, Wash., for appellant.

Winter S. Martin, Arthur Collett, Jr., and Harry S. Redpath, all of Seattle, Wash., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and ST. SURE, District Judge.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment in an action at law, tried to a jury, in which the appellee sought to recover damages for loss of property and alleged personal injury. The case has previously been before this court on appeal. 41 F.(2d) 356, 357, certiorari denied 282 U. S. 869, 51 S. Ct. 76, 75 L. Ed. 768.

At about 5 p. m., December 5, 1927, the steam ferry Olympic, owned and operated by the appellant, collided with the small power fishboat, Magna, owned and operated by the appellee. The collision occurred in Puget Sound, northwest of Seattle, Wash. The Magna was sunk, and the appellee jumped overboard when he saw his boat was doomed. He was rescued by a lifeboat from the Olympic.

Before the collision, both boats were traveling along a general northwesterly course, the Olympic being the overtaking vessel. The courses of the two vessels, however, were not parallel. The appellee admits that the Magna was required to maintain a stern light that would be visible to an overtaking vessel, and likewise admits that the Magna "did not have a stern light that was sufficient to meet the technical requirements of the Motor Boat Act."

The Magna was 33 feet in length. Accordingly, she belonged to class 2 of section 2 of the Motor Boat Regulations Act (46 USCA § 512, class 2). Section 3 of that act (46 USCA § 513) provides in part as follows:

"Every motor boat in all weathers from sunset to sunrise shall carry the following lights, and during such time no other lights which may be mistaken for those prescribed shall be exhibited. * * *

"(b) Every motor boat of classes 2 and 3 shall carry the following lights: * * *

"Second. A white light aft to show all around the horizon."

Strictly speaking, the appellee had no aft light whatsoever on his boat, as may be seen from his own testimony: "It (the Magna) had a mast on before I went to Ballard, aft of the pilot house, and that had a light on top of it, a light that showed all around the horizon. We had the light on the mast at the time we had the mast up. It shown (sic) all around the horizon. I took this mast out of the boat before I went to Ballard. I didn't have it on when the collision occurred, and I didn't have it on when I went out from Ballard, and the mast and light were missing at the time I came out in the Sound on the evening of the collision. I had another light on the boat that I normally carry, a six-volt light, a white light, and it would shine aft of the beam of the boat and aft. That showed from the stern of the vessel."

In his brief, the appellee admits that this so-called "stern light" was attached to the sill of the after door of the pilot house, "suspended at a height of five feet above the Magna's main deck aft in the open doorway, in such manner as to show and be clearly visible from any angle aft of the beam * * * on each side."

But the appellee, in his testimony, made it plain that the light was hanging "right in the door of the pilot house, two inches inside of the door," and that the pilot house itself was "located forward on top of the trunk cabin," and that "the after side of the pilot house would be about the forward half of the boat."

Thus it will be seen that there was no light whatsoever in the after part of the Magna; and, furthermore, that the light in the pilot house, which the appellee apparently regarded as his after light, "did not show ahead or forward of her beam," as required by law.

The appellee asserts that there "was still light enough at the time of collision, even though after sunset, for those on the Olympic to see an object out on the water ahead of them very clearly and for such a distance as to enable the Olympic's pilot and lookout to see the Magna very clearly if they had been attending to their duties." Lawrence Fisher, United States meteorologist at Seattle, testified that on that day the sun set at 4:17 p. m., and that "civil twilight" ended at 4:52 p. m. He defined "civil twilight" as "the period of time during which ordinary outdoor occupations are regarded as possible."

The appellant admits that the "Olympic's lookout was not looking ahead for four or five minutes prior to the collision."

The appellant offers 25 assignments of error, which are grouped into six specifications in the brief.

The most formidable attack against the judgment is the one based upon the court's instructions as to the sufficiency of the appellee's so-called after light, and the effect of the appellee's failure to display the kind of after light prescribed by the statute.

Interspersed among correct statements of the law, there are found in the instructions a number of assertions that are clearly erroneous. Of the latter, we quote the following:

"And, again, that is the attitude of counsel for the plaintiff, when he says there is only one question in this case, and I agree with him, whether the aft light on this vessel of the fisherman was there."

"If that was his aft light, and there is no reason why it could not have been, even though it was not across the dividing line in the middle of the ship—between the bow and the stern—if that was his aft light, and it was the only aft light that he had, if it was not so placed that it could be seen all around the horizon. It could be seen from behind, but it could not be seen from either side, because it was within the frame two inches, and, of course, it could not be seen from the front. But you must remember, too, that the law is a practical thing, and it does not require any useless thing. If that light served the purpose of an aft light to a following vessel, it was altogether immaterial whether it would show from the sides or show from ahead, so far as that vessel is concerned, but provided it was sufficient to serve the purpose of an aft light for the following vessel, and could not at all have misled it or have contributed to the collision which happened. I myself cannot reason out, and I think counsel has taken that attitude—I cannot reason out why, if that light was there, lit, and no obstruction in plaintiff's rear, and plaintiff testifies that there was none—I cannot understand why it would not serve just as well for the following vessel as if it could be seen from either side and ahead. If you can, why that is your privilege, for you to finally determine this. So it comes right down to that question—the attitude taken by the plaintiff's counsel in his argument, and the court takes it as a matter of law."

"You have two questions to decide in this case, outside of the damage, and you must decide them both in the affirmative before you can find for the plaintiff. First it is proven by the greater weight of the evidence that Nelson's light in his cabin door was where he testified it was; that it was the kind that he testified it was, and lit sufficiently long before the collision so that it could have been seen by the defendant's lookout, so that the collision might have been avoided. * * * He is out of the case and out of court right there, unless you find by the greater weight of the evidence that his light was there, as he tells you, with that degree of sufficiency—a six-volt light—and lit long enough to have been seen and avoided by the defendant's vessel, had it a watchful lookout at the time."

"If, however, you find that in favor of the plaintiff, then the next question is, in its position there in the door, if you find it was there and lit—not visible ahead and not visible on the sides—did it have anything to do with or is it clear to you that it contributed nothing to the collision that followed? Here is a vessel coming from behind—the defendant's vessel. If that light had been visible on the sides and ahead, would it have better enabled the defendant's vessel aft to avoid him and see him and avoid him? I do not think so, and counsel's attitude for the plaintiff in his argument likewise was the same. That is common sense. If the light was there, and visible from the defendant's vessel, had it a watchful lookout, as counsel said fairly in his argument, if it was there long enough, it would have enabled the defendant to avoid the collision."

"That is the case before you. It simmers down to this, Lady and Gentlemen of the Jury, that taking into consideration all of the evidence in the case, both for the plaintiff and the defendant, and the circumstances, if you find by the greater weight of the evidence that the plaintiff had, as he testified to you, a light in the door of his pilot-house, facing the rear, of 6-volt size, as he tells you, and burning long enough before the collision so that a watchful lookout on defendant's vessel could have seen it, and so could have avoided the collision, he is entitled to recover. If you do not find that by the greater weight of the evidence, he is not entitled to recover."

"The Court. I told that to the jury. That is true. I thought I made that plain to the jury by stating that the whole question depended upon whether or not he had his light lit. * * * That question, then, comes to the question of light. If the light was not there, of course the plaintiff was negligent even though the defendant was negligent, if the plaintiff was negligent, too, why the defendant is entitled to a verdict."

"The Court.—Yes. I mean in its place, forward by the beam, as it apparently was, it served every purpose of an aft light which the law requires and names as an aft light."

██ The foregoing instructions were erroneous, in that they stressed the thought that, if the light was sufficient from a "common sense" point of view, the appellee had discharged his duty. The mandatory provisions of the statute were apparently overlooked.

Statutes of the kind that we are here considering are enacted for the safety of navigation, and are strictly enforced. He who violates such a statute must prove that such violation could not have caused the accident.

More than half a century ago, the rule was clearly stated by the Supreme Court, in The Pennsylvania, 19 Wall. (86 U. S.) 125, 136, 22 L. Ed. 148, as follows:

"The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

This doctrine has been repeatedly adhered to by the Supreme Court. Belden v. Chase, 150 U. S. 674, 699, 702, 703, 14 S. Ct. 264, 37 L. Ed. 1218; The Britannia, 153 U. S. 130, 143, 144, 14 S. Ct. 795, 38 L. Ed. 660.

Indeed, the proper instruction to be given in the instant case was plainly set forth by this court when the matter came up on appeal here the first time. On that occasion, Judge Rudkin said:

"On the foregoing facts the jury would be warranted in finding that both vessels were at fault, the Olympic for failure to keep a proper lookout, and the Magna for failure to display a proper signal; and in admiralty the rule is well settled that a vessel committing a breach of statutory duty must not only show that probably her fault did not contribute to the disaster, but that it could not

have done so. Belden v. Chase, 150 U. S. 674, 699, 14 S. Ct. 264, 269, 37 L. Ed. 1218. And, while this action was tried on the common-law side of the court, the rights and liabilities of the parties are measured by the admiralty law, and not by common-law standards. Chelentis v. Luckenbach S. S. Co., 247 U. S. 372, 38 S. Ct. 501, 62 L. Ed. 1171.

"The appellant requested an instruction in conformity with the foregoing rule in admiralty, but the request was refused On the contrary, the court instructed the jury, in effect, that, if the appellee had a proper and sufficient light aft which could be seen at a sufficient distance by a vigilant lookout on the overtaking vessel, he was entitled to recover. In other words, the court ignored the mandatory requirement of the statute in reference to the light aft, leaving the question of its sufficiency entirely to the jury, and imposed upon the appellant the burden not only of proving a breach of statutory duty on the part of the appellee, but also that such breach contributed to the disaster. The requested instruction was in accordance with the admiralty rule, and the instruction given ignored the statute and was contrary to the admiralty rule. For these errors, the judgment must be reversed."

A comparison of the instruction characterized by Judge Rudkin as being erroneous, with the language used by the trial judge in the second case, quoted in extenso above, will reveal a striking similarity. It seems that the court below fell into the same error when the case was retried.

■ It is true, as we have already pointed out, that the lower court did include correct statements of the law in his instructions. But nowhere did the trial judge specifically correct or repudiate the erroneous exposition of the rule as to the mandatory effect of the statute. Nowhere did he bid the jury expunge from their minds such erroneous statements, and be guided only by the correct instruction.

And in this way, and this way alone, can such error be corrected by the trial judge. In Deserant v. Cerillos Coal Railroad Co., 178 U. S. 409, 420, 421, 20 S. Ct. 967, 972, 44 L. Ed. 1127, the court had under consideration the sufficiency of instructions dealing with an act of Congress regulating the ventilation of mines. In that case the court said:

"We think the instructions numbered 1, 6, and 11, given at the request of the defendant, ignored the obligations of the act of Congress, and are so far inconsistent with the other instructions that they tended to confusion and misapprehension—making the duty of the mine owner relative, not absolute, and its test what a reasonable person would do, instead of making the test and measure of duty the command of the statute. The act of Congress does not give to mine owners the privilege of reasoning on the sufficiency of appliances for ventilation or leave to their judgment the amount of ventilation that is sufficient for the protection of miners. It prescribes the amount of ventilation to be not less than 55 cubic feet per second; it prescribes the machinery to be adequate to force that amount of air through the mine to the face of every working place. Nor does it allow standing gas. It prescribes on the contrary that the mine shall be kept clear of standing gas. This is an imperative duty, and the consequence of neglecting it cannot be excused because some workman may disregard instructions. Congress has prescribed that duty, and it cannot be omitted and the lives of the miners committed to the chance that the care or duty of someone else will counteract the neglect and disregard of the legislative mandate.

"But, aside from the statute, it is very disputable if the instructions were correct. It is undoubtedly the master's duty to furnish safe appliances and safe working places, and if the neglect of this duty concurs with that of the negligence of a fellow servant, the master has been held to be liable. [Cases cited.]

*"This principle was stated in the general charge of the court, but it was materially modified in the application, and not at all considered in giving the instructions requested by the defendant.*

"No exceptions, however, were taken to any portion of the general charge of the court, and no question arising thereon is open to our review on this writ of error. But as we remand the case for a new trial on account of the errors which we have pointed out irrespective of the general charge, we deem it best to say that we must not be understood as affirming anything contained in instructions numbered 11 and 12, or any other instruction which conflicts with the principles announced in Texas & P. R. Co. v. Archibald, 170 U. S. 665, 671, 18 S. Ct. 777, 42 L. Ed. 1188, 1191." [Italics our own.]

In Cumming v. Pennsylvania R. Co., 45 F. (2d) 152, 153, 154, the following language was used by the Circuit Court of Appeals for the Second Circuit:

"Having been told plainly that the plaintiff was cast unless it explained how the injury occurred and established that it was free from negligence, nothing short of an express repudiation of that charge coupled with a correct statement of the law can be thought to have erased the erroneous impression from the minds of the jurors. The subsequent charge given, not an express correction and with no attempt to point out to the jury the difference between it and what had previously been said, would, in all probability, have been treated only as a restatement of what had gone before. Quite likely the jury was unaware of any change. At best, it did know of it and was left to take its choice between two inconsistent statements of the law, one of which was wrong and one right. This so deprived the defendant of its right to have the jury plainly and correctly instructed to the end that there should be no misapprehension of the law that the exception to the charge based on this ground must be sustained. Deserant v. Cerillos Coal Railroad Co., 178 U. S. 409, 20 S. Ct. 967, 44 L. Ed. 1127 [supra]; Memphis Furniture Manufacturing Co. v. Weymyss Furniture Co. (C. C. A.) 2 F.(2d) 428, 432."

We believe that the erroneous instructions of the court call for the reversal of the case. We will consider briefly, however, the other specifications of error.

■ Specification No. 1 states that the court erred in admitting the testimony of Emil Schuman, a witness for the appellee, as to the visibility of the light in the cabin or pilot house after the collision, as testimony bearing upon the collision itself. Schuman, a passenger on the Olympic at the time of the collision, testified that he "rushed right upstairs," after he felt the impact of the collision, and that it "did not take me over a minute to get to that point [on the upper deck] after I felt the bump." While it is true that the position of the two boats shifted after the collision, the time at which Schuman saw the light in the "engine-room or cabin, whatever it may be," was sufficiently close to the time of the accident as to warrant its being submitted to the jury for what it was worth.

■ Specification No. 2 alleged that the court erred in admitting the appellee's testimony as to the visibility of "other lights" in his pilot house at times prior to the day of the collision, and his speculation upon the visibility of the light in the pilot house at the time of the collision. Reference to the assignments themselves, however, discloses that Nelson was asked not about "other lights," but about "that light."

We believe that Nelson's testimony as to the visibility of the light on other occasions, as well as at the time of the collision, was admissible, especially in view of the fact that, under the doctrine we have discussed above, he was charged with the duty of establishing that his violation of the law could not have contributed to the accident. He should not be deprived of the opportunity of adducing whatever testimony he can in the effort to establish that the light was in fact visible to any one keeping a proper lookout on an approaching vessel. The weight of his testimony would be a matter for the jury to determine.

■ The same specification also includes assignment VI, which sets forth that the court erred in permitting the appellee to answer a question as to how far he could see any vessel ahead of him, "a vessel the size of the Magna." We do not find error in this, especially in view of the fact that the appellee, in answering, limited his reply to "the time of that collision."

Specification 3 asserts that the court erred in denying the appellant's motion for a directed verdict. We believe that there was sufficient evidence to go to the jury, when one considers the testimony of the appellee himself and that of Schuman.

Specifications 4 and 5 deal with instructions given and refused. We have already dealt at some length with this phase of the case. We wish to add, however, that the instruction as to the appellee's life preservers, requested by the appellant, was correct, and should have been given.

■ Specification 6 attacks the court's instruction on positive and negative testimony. In view of the testimony of Schuman that he saw the light, and that of the master and the mate that they did not, the instruction was proper. The Commonwealth (C. C. A. 9) 36 F.(2d) 581.

■ The appellee has moved to dismiss the appeal on the ground that the appellant waived its right to appeal by procuring, in the judgment below, a set-off of $312.05 against the amount of the verdict. This set-off represented the amount of the appellant's judgment for costs in the first appeal awarded by this court.

The weight of authority is in favor of the rule that the defeated party may pay a judgment without thereby waiving the right of

appeal. In Dakota County v. Glidden, 113 U. S. 222, 224, 5 S. Ct. 428, 429, 28 L. Ed. 981, the court said:

"There can be no question that a debtor against whom a judgment for money is recovered, may pay that judgment, and bring a writ of error to reverse it, and if reversed can recover back his money. And a defendant in an action of ejectment may bring a writ of error, and, failing to give a supersedeas bond, may submit to the judgment by giving possession of the land, which he can recover, if he reverses the judgment, by means of a writ of restitution. In both these cases the defendant has merely submitted to perform the judgment of the court, and has not thereby lost his right to seek a reversal of that judgment by writ of error or appeal."

See, also, Josevig-Kennecott Copper Co. v. James F. Howarth Co. (C. C. A. 9) 261 F. 567, 568; Hoogendorn v. Daniel (C. C. A. 9) 202 F. 431, 432; State v. Winthrop, 148 Wash. 526, 535, 269 P. 793, 59 A. L. R. 1265; Hogue v. McAllister, 122 Wash. 347-349, 210 P. 671; 3 C. J. 675, § 550; 2 R. C. L. 64, § 47.

If payment of the entire judgment does not constitute waiver, a fortiori the offering of a prior judgment in partial set-off does not constitute a waiver of the right to appeal from the second judgment.

Judgment reversed, and cause remanded for retrial.