## THE MARY SHAW.

*(District Court, D. Maryland.   April 16; 1881.)*

1. COLLISION—TUG AND TOW.
    A tug, with vessel in tow, having given two blasts of her whistle without hearing any reply, steered in a narrow channel to pass an approaching steamer starboard to starboard instead of port to port, and did not repeat her signal until too late to avoid a collision, which took place between the steamer and the tow on the extreme edge of the channel. *Held*, that the tug was solely to blame.

2. SAME—NAVIGATION—LOCAL CUSTOM.
    *Held*, that there is no local custom in the channels in the Patapsco river, and in the Chesapeake bay, at its mouth, for large vessels descending the channels to take the easterly side, and that the establishment of such a custom, not being called for by any necessity, is to be deprecated as a dangerous departure from the settled rules of navigation.

In Admiralty.   Cross-libels.

*John H. Thomas* and *A. Sterling, Jr.*, for libellants.

*Charles Marshall* and *Sebastian Brown*, for respondents.

MORRIS, D. J. These are cross-libels growing out of a collision between the British steam-ship Gulnare, 250 tons, and the schooner Charles Morford, 360 tons, in the Chesapeake bay, near the mouth of the Patapsco river, on March 5, 1881. The Gulnare left Baltimore, bound for the West Indies, on the afternoon of March 5, 1881, and at 7:30 P. M. was about two-thirds the way down the Craighill channel, when she met the steam-tug Mary Shaw coming up the channel with the schooner Charles Morford in tow.

The case stated by the libel filed by the owners of the Gulnare is that those in charge of her first saw the lights of the tug and tow at the distance of about two miles, and continued to see both their side lights until they had approached to within about three-fourths of a mile, when they heard one whistle from the tug, indicating that she proposed that the vessels should pass each other on the port side; that the Gulnare at once responded with one whistle, and ported sufficiently to shut out the green lights of the tug and schooner, and proceeded, keeping their red lights half a point or more over the steamer's port bow; that when the tug got within about three lengths of the steamer she blew two whistles and suddenly starboarded her helm, shut out her red light, showed her green light, and crossed the steamer's bow; that the steamer immediately stopped, reversed her engines, and succeeded in clearing the tug, and, while going astern, endeavored, by starboarding her helm, to turn her head to starboard so as to avoid the schooner, but that the schooner ported her helm when nearly abreast of the steamer, and, being under the press of all her lower sails, struck the steamer near her port cat-head, and so injured her that it was found necessary to have her towed back to Baltimore for repairs.

The case stated by the answer of the owners of the tug is that she was coming up the Craighill channel, having the schooner in tow attached to her by a sixty-fathom hawser, and was near the western side of the channel, proceeding at

about five miles an hour, when she first saw the lights of the steamer. They aver that it is customary for lighter craft approaching the port of Baltimore to give the eastern side of the channel to larger vessels, and especially to large steamers, as they can be more safely navigated on that side; that when the lights of the steamer were first seen, all her lights were visible, and that when she was between a mile and three-quarters of a mile off the tug gave two distinct and clear blasts of her whistle, indicating that the steamer should pass on the tug's starboard side; that *no response* was given by the steamer, but she continued to approach, showing both her side lights, when the tug again gave two blasts of her whistle, to which the steamer responded with two very faint whistles, but *continued to show her port light,* as if going across the course of the tug, when, perceiving that the steamer had not heeded her signals, the tug starboarded her helm, and the steamer passed her about the steamer's breadth off on the tug's starboard side, and came into collision with the schooner, the collision taking place outside of the western edge of the channel.

The Brewerton and Craighill channels form a continuous water-way from the Chesapeake bay to the port of Baltimore, the first being in the Patapsco river proper, and the latter in the Chesapeake bay at the mouth of the river, and nearly at a right angle with the first. They are from 250 to 400 feet wide, and were made by dredging out the natural channel. The navigation of these channels requires careful seamanship and an exact observance of every rule intended to prevent collisions. *Appleby* v. *Kate Irving,* 2 FED. REP. 924.

The rule governing steamers, and the signals they shall give when about to pass each other in these channels, is expressed in the eighteenth rule of the act of congress: "If two vessels under steam are meeting end on or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other;" and also by the pilot rules for lake and seaboard navigation:

"Rule 1. When steamers are approaching each other 'head and head,' or nearly so, it shall be the duty of each steamer

to pass to the right or on the port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give as a siginal of his intention one short and distinct blast of his steam-whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam-whistle, and thereupon such steamers shall pass to the right or on the port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by the pilots as meeting head and head, 'or nearly so,' or if the vessels are approaching each other in such a manner that passing to the right (as above directed) is deemed unsafe by the pilot of either vessel, the pilot so first deciding shall immediately give two short and distinct blasts of his steam-whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam-whistle, and they shall pass to the left or on the starboard side of each other."

"Rule 3. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from the signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage-way, until proper signals are given, answered, and understood, or until the vessels shall have passed each other."

The answer of the tug and the testimony of her officers attempts to set up a custom by which it is claimed the statutory rule is superseded. By this alleged custom they assert the rule to be that large steamers and heavy ships always take the easterly side of the channel, that being the side marked by buoys, and therefore the safest for them to keep to. There is no current or tide to contend with, and the only reason for such a custom would be that the depth is somewhat more uniform on the easterly side, and the buoys being on that side, furnish a guide for more exact steering by daylight, and that in making the turn from the Brewerton into

the Craighill channel it·is more easily made on the outside of
the curve. ·          ·.

The most experienced Chesapeake Bay pilots, in the habit
of daily piloting the largest steamers, testify that there is no
such custom.    The president of the board of pilots expressly
denies its existence, and says that they understand that the
vessel· desiring to proceed contrary to the statutory rule must
get permission of the other vessel, and if the other vessel
does not give it the rule must be obeyed.

No doubt the fact that heavy vessels do frequently ask for·
and obtain, by an interchange of signals, such permission,
may have lead to an expectation that they will usually ask it,
and smaller craft may, as a habit, hold themselves ready to
accord it; but this is the extent to which the practice extends..
It seems to me that its further extension is to be deprecated.
These channels are traversed by vessels of all nations, and
any attempt to depart from the well-known rules of maritime
law, and to substitute local customs, not founded upon actual
necessity, but upon mere convenience, is likely to lead· to
uncertainty and disaster.    The dangers arising from ·a de-
parture from settled rules of navigation have lead admiralty
courts to hold that the local custom which is to justify such
departure must be founded upon necessity arising from per-
manent local peculiarities, such as rocks, strong currents in
crooked rivers, and the like, and that the exception should be
as distinct and definite as the rule itself.    Lowndes on Col--
lisions, c. 3.

In the present case those in charge of the tug seem to have
mistaken the Gulnare for a large steamer, and to have.
expected that she would want the eastern side of the chan-
nel, and they gave her, at the distance of nearly a mile, two
blasts of the whistle as a ̈signal that they proposed to take
the western side.    They received *no* reply, as they state, but
they steered for the western side and proceeded without any
further signal until the steamer was within three lengths of
them, when they signalled again.    The vessels had then got
into such proximity that a collision was imminent if not
unavoidable.

The case of *The Milwaukee*, 1 Brown, Adm. 313, is in many respects similar to the one under consideration, and is very ably discussed by Judge Longyear. He very distinctly states the law applicable to the case of a steamer which, in a narrow channel, has gone contrary to the statutory rule, and undertakes to justify herself by an interchange of signals. As he states it, the burden of proof is upon such a vessel to establish by clear and satisfactory proofs—(1) That a proposition to depart from the statute was made by her by means of the prescribed signals, and in due season for the other vessel to receive the proposition and act upon it with safety; (2) that the other vessel heard and understood the proposition thus made; (3) that the other vessel accepted the proposition.

Taking the case as made by the answer of the tug, and the testimony offered on her behalf, it plainly appears that those in charge of her relied on their expectation that the steamer would desire to take the eastern side of the channel, —that is to say, upon the custom which they allege to exist,— and paid no attention to the fact that their signal was not answered.

Dr. White, a passenger of the schooner who happened to be in the tug's pilot-house, testifies that he saw the steamer's green light when the tug's first signal was given; that they received no answer, and then the steamer's green light was shut out, and they saw her red and continued to see her red light until the steamer was within about the length of the court-room, when the second signal was given; that the steamer then answered with two whistles; that he was getting alarmed, and he said to the mate: "It is all right, now he has answered;" and the mate replied: "Yes, but she is showing her red light all the time; she don't change her course."

Richardson, the mate, who was at the wheel, says, when he gave the first two whistles and starboarded his wheel the steamer was about three-quarters of a mile off, and he expected she would want the east side of the channel, and he steered to bring himself on the western side; that he listened

for an answer, and, getting none, blew two more blasts, which were answered with two, and about that time the steamer's green light was shut in, and the steamer seemed about to run over them. He estimates that when the second signal was given the steamer was within two or three of her lengths from the tug.

The master of the tug, who was also in the pilot-house, tells substantially the same story. It is apparent, therefore, that those in charge of the tug, notwithstanding she received no answer to her first signal, persisted in going to the westward, and attempting to pass on the steamer's starboard side, until the steamer, continuing to show her red light and obviously also going to starboard, was so close that a collision with either the tug or her tow was almost certain. Whether the two blasts of her whistle, then given by the tug, were answered by the two blasts, as they claim, or with one, as those on the steamer testify, does not seem to me to be, in itself, a matter of serious importance, for neither vessel then had it in her power to perform any maneuver which would, except by some lucky chance, have averted the disaster. It is clear that the tug was in fault. I have had difficulty in satisfying myself as to whether or not the steamer was also to blame. No one, I think, could take up the consideration of the steamer's case without a leaning against her, and a predisposition to find her in fault. Her officers, although accustomed to the command of sailing vessels, were almost without experience in steamer navigation, and it was their first voyage in this steamer. They were not familiar with the channel, and they were running out in the night-time,—a very bold thing for them to undertake unassisted, and which reasonable prudence would seem to have forbidden. But because her officers were likely to fail in seamanship, I am not to take it for granted that they did, unless the evidence convicts them of it.

The steamer was, at the time of the collision, on that side of the channel on which she had a right to be; all her officers were at their posts of duty; they all testify that they heard the first signal of the tug, and that it was but one blast of the

whistle, and that they answered it with one blast. The vessels were then nearly a mile apart, and it is quite possible that, without neglect, they did so understand it, more especially as one blast was the signal they naturally expected to get. That their reply was not heard on board the tug may have been because the steamer's whistle appears not to have been a loud one. Supposing the tug was going to pass them on the port side, they immediately put their helm a little to port. They declare that they saw nothing to undeceive them, as to the tug's intention, until they heard her second signal and saw her green light, and then they were so close that all they could do was to stop and reverse. That the bells to stop were at once rung and obeyed I have no doubt, although I do doubt the assertion that the steamer was going astern when the schooner struck her. There would not appear to have been time sufficient for a propeller to have stopped her headway and begun to go astern; but that her headway was greatly checked, if not entirely overcome, is, I think, demonstrated by the character of the damage resulting from the collision, as well as by the direct testimony of those on board the steamer. The actions of the officers of the steamer are all consistent with their account of the signals as they claim to have heard them and to have answered them, and, unless I were to assume that they were ignorant of the meaning of the signals, I do not find anything which the law recognizes as a fault to convict them of having contributed to bring about this collision.

It is not improbable that a pilot familiar with the navigation of the channel, and having some suspicion of the expectation which was in the mind of the master of the tug, might have discovered something in her movements which would have arrested his attention in time to have averted the consequences of the tug's fault; but to undertake to hold the steamer legally blamable because her officers did not have this high degree of local experience would be, I think, unwise, as by a strict adherence to the statutory rules the navigation of the channel should be safe to mariners having the ordinary experience and capacity necessary to navigate vessels.

I have not overlooked the question of the steamer's speed. She would appear to have been under three bells, at about three-quarters speed, say from seven to eight miles an hour. She was a very small steamer, easily handled, and drawing only from ten to twelve feet of water, and she could, without much risk of grounding, have run outside of the channel on either side. Such speed on a clear night, when lights can be plainly seen, is ordinarily perfectly safe for such a vessel, and I cannot see that under the circumstances it was improper.

I had in the case of *Appleby* v. *The Kate Irving*, 2 Fed. Rep. 924, to consider the question of speed in these channels, and in that case held the steamer to blame for proceeding at eight miles an hour, which was her full speed. That, however, was a heavily-laden steamer of 1,500 tons, compelled by her draught of water to keep in the channel, and keeping up her full speed with an obstruction right ahead and in full view; and in that case it appeared to me that the collision resulted in part from a sheer the steamer took arising in great part from her high speed and the difficulty of steering her in the channel, and that, as she had timely notice that the approaching vessels must get out of her way in order to avoid a collision, she should have slackened her speed or have been going at a less rate to enable them to do it, and I divided the damages.

In the present case, upon all the testimony, I am brought to the conclusion, although I confess with some hesitation, that the steamer is not in fault, and that the tug must bear the whole damage. Nothing has appeared to lead me to think that the schooner committed any fault, or that any mismanagement is to be imputed to her.