In the Matter of the Complaint of Pacific Bulk Carriers, Inc., as Owner of the M. V. ATLANTIC HOPE for Exoneration from or Limitation of Liability.

PACIFIC BULK CARRIERS, INC., Plaintiff and Third-Party Plaintiff,

v.

M. V. SADOHARU MARU and Yamashita Shinnihon Kisen, K. K., Third-Party Defendants.

No. 73 Civ. 3220 (CES).

United States District Court, S. D. New York.

June 15, 1979.

Kirlin, Campbell & Keating by Richard H. Brown, Jr., Harry A. Gotimer, New York City, for United States Lines.

Healy & Baillie by Allan A. Baillie, John C. Koster, New York City, for Yamashita Shinnihon Kisen, K. K.

## MEMORANDUM DECISION

STEWART, District Judge:

This action in admiralty[1] arises out of a collision which occurred on April 20, 1973 when the steamship American Aquarius ("Aquarius") was struck on her port side aft by the bow of the motor vessel Atlantic Hope ("Hope") in international waters south of the headland Shiono Misaki on the southern coast of Japan. Both vessels sustained damages. All cargo and personal injury claims have been settled. The case went to trial before us to determine liability for the collision damages. Set forth herein are our findings and conclusions on this issue.

There are three parties to the litigation: Pacific Bulk Carriers, Inc., owner and operator of the Hope; United States Lines, Inc., owner and operator of the Aquarius; and Yamashita Shinnihon Kisen K. K., a Japanese corporation and owner and operator of the motor vessel Sadoharu Maru ("Maru"). The Maru and its owner were brought into the litigation by Pacific Bulk through a third party complaint filed in 1975, two years after the action was commenced in 1973. The issues at trial were the liability, if any, of each of the three parties and, if more than one is found liable, the proportion of liability of each party held liable.

The Hope is an 18,389 gross ton bulk carrier, 634 feet 10 inches in overall length and 75 feet in breadth. The Aquarius is a 19,127 gross ton container carrier, 704 feet 6 inches in overall length and 90 feet in breadth. The Maru is an 8,780 gross ton general cargo vessel, 467.3 feet in overall length and 65 feet 6 inches in breadth.

The collision occurred early in the morning of April 20 at approximately 0321 hours. The night was dark and overcast; although

Hill, Betts & Nash by David C. Wood, New York City, for Pacific Bulk.

1. We have jurisdiction pursuant to 28 U.S.C. § 1333.

there was occasional light rain, visibility was good, about six to eight miles. There was a light westerly wind and the current was also from the west.

At the time of the collision, all three ships were within an area in international waters off Japan as to which sailing lane separation rules (sometimes referred to as a traffic separation scheme ["TSS"]) had been prepared by the Japan Captains' Association, a nongovernmental, unofficial body. These rules, like other similar rules or schemes, are designed to provide separate sailing lanes in areas of heavy deep-sea traffic. Typically, such a scheme provides for two separate lanes, one for traffic in one direction, the other for traffic in the opposite direction. The lanes are divided by a separation zone which traffic may not enter. Normally, traffic in a lane is expected to keep to starboard of the zone, that is, traffic entering the scheme keeps to the right of the zone. The TSS here involved is called the Shiono Misaki zone; the two lanes are one and a half miles wide and the separation zone one mile wide. At Appendix A is a copy of the zone as published by the Japan Captains' Association.

Traffic separation schemes were introduced in international waters in coastal regions sometime after World War II and the concept was accepted by the Intergovernmental Maritime Consultative Organization ("IMCO"). By the end of 1972 approximately sixty separate voluntary Sailing Lane Separation Schemes had been introduced, and a number of countries had made such schemes compulsory. The Shiono Misaki TSS, along with seven others off the coast of Japan, was established effective June 1, 1970 by the Japan Captains' Association. It was designed to conform to IMCO guidelines. The Association, which apparently has no official governmental status, submitted a request for observance of the scheme to the Japanese Shipowners' Association, the Coastal Shipping Association and the Japan Foreign Steamship Committee. As a result of the efforts of these organizations, the scheme received wide dissemination to both Japanese and foreign owners, operators, masters and other maritime interests. The captains of all three ships here involved, the Aquarius, Hope, and Maru, were aware of the scheme. However, none of the Japanese sailing lane schemes were submitted to nor approved by IMCO, the only organization empowered to recommend traffic separation lanes in international waters.

The events leading up to the collision were as follows. Aquarius left Kobe at 2300 hours on April 19, 1973 bound easterly for Yokohama. Her radar was in use and operating properly. At all material times thereafter, the master, watch officer, and an able seaman wheelsman were on the bridge; an able seaman was posted on the bow as lookout.

Prior to approaching the Shiono Misaki TSS, Aquarius had passed through two previous zones, observing the prescribed courses and lanes in each case. At about 0225, after leaving the second of these two TSS's, she set a course of 115° which, if maintained, would have taken her into the southerly, eastbound lane of the Shiono Misaki TSS. Her speed was about 23 knots through the water, her usual sea speed, which she maintained until immediately before the collision.

At 0227 hours, however, Aquarius observed that she was overtaking a large eastbound vessel on her port bow which appeared to be on a course which would take her across the bow of Aquarius from left to right. In order to pass this vessel to starboard, Aquarius altered course to port to 110°. When the overtaken vessel changed course to the left of 115°, Aquarius again changed course to 105°. After overtaking and passing the other vessel (which has never been identified), Aquarius came back to a course of 115° at about 0303 hours. (She remained on this course until moments before the collision.) However, Aquarius was then about 2½ miles north of her original course and was headed directly into the westbound, instead of eastbound, lane of the Shiono Misaki TSS, which was approximately 1½ miles to the east of Aquarius.

Aquarius thereupon at about or just before 0309 sighted the masthead, range and green (starboard) lights of three approaching ships which were crossing Aquarius from left to right off the port bow.[2] Shortly thereafter, the master of the Aquarius observed and plotted these vessels on radar off the port bow at distances of 5½ to 6½ miles; he also determined their approximate courses and speeds. These ships were the Maru, the Hope and the American steamship Colorado. The Colorado was then in the separation zone of the TSS; she remained on course in that lane and ultimately crossed well ahead of Aquarius. The Colorado did not become a material factor in the collision between Aquarius and Hope.

Upon sighting these three vessels, the master of the Aquarius concluded that it was the duty of the Aquarius as the privileged vessel in a crossing situation under International Rule 19 (see below) to keep course and speed; this was done, and properly so. *Belden v. Chase*, 150 U.S. 674, 698–699, 14 S.Ct. 264, 271–272, 37 L.Ed. 1218 (1893); *see Northern Transportation Co. v. Davis*, 282 F.2d 209, 211 (2d Cir. 1922); *United States v. S. S. Malden*, 224 F.Supp. 705, 708–709 (E.D.Va.1963), *aff'd*, 341 F.2d 292 (4th Cir. 1965).

Thereafter, as the Aquarius' master continued to observe the three crossing vessels, the Maru shortly after 0315 turned to starboard while about one mile from Aquarius, and safely passed the Aquarius port to port.[3] When Maru changed course, Hope was at least 1½ miles from Aquarius and on an apparent collision course with Aquarius. When Hope was about one mile away, Aquarius sounded five blasts on her whistle. Hearing no reply and seeing no avoiding action by Hope, Aquarius sounded a second 5-blast signal about 0320. Moments later, the master of Aquarius ordered hard right rudder and sounded one short blast to indicate the course alteration. He also ordered slow and stop engines, which order was executed. At approximately 0321, Hope collided with the port side aft of Aquarius.

Maru was en route from Nagoya to Kobe, Japan. On her bridge at all pertinent times were the captain, the second mate and the quartermaster or helmsman. The second mate acted as lookout and operated the radar. She entered the westbound lane of the Shiono Misaki TSS, and maintained a speed over the ground of about 14 or 15 knots on a course approximately 250°. In the TSS, Hope initially was ahead and off the starboard bow of Maru on a parallel course. At about 0300, Maru began to pass Hope on the latter's left. The vessels were then about 1800 feet apart. At that time, Maru observed off her starboard bow the red light on the port side of the approaching Aquarius. Maru, which planned to change course shortly to 295° to conform to the shift in direction of the TSS, also observed that Aquarius was on a course which would be approximately the reciprocal of what the course of the Maru would be upon altering course to 295°.

After passing Hope at about 0305 without changing course or speed, Maru continued on course and drew ahead of Hope. At or shortly after 0315, Maru blew one blast and, in view of the approach of Aquarius, changed course to 295°, thereby crossing in front of Hope. We find from the conflicting evidence that Maru was close to three-fourths of a mile ahead of Hope when she crossed the latter's bow at about 0317. We also find that, when Maru turned to cross Hope, she was past and clear and there was no danger of collision.

Shortly thereafter, Maru passed Aquarius port to port at a distance of approximately one quarter mile and continued in a westerly direction until after the collision.

Hope was en route from Chiba to Oita, Japan. She planned to and did enter the

2. Aquarius contends that this sighting occurred before she entered the TSS; our conclusions would be the same, however, whether this was before or after she entered the TSS.

3. After the Maru had turned to starboard, Aquarius turned right from 115° to about 118°–119° to give Maru a bit more room to pass. This minor course change did not affect subsequent events.

westbound lane of the Shiono Misaki TSS on a course of about 250°; however, she planned to continue on that course on the southwest leg of the TSS and then, instead of turning into the northwest leg as the Maru did, to cut across the zone towards Oita to the southwest. Accordingly, she would have passed through the separation lane and the eastbound lane, if she had not collided with Aquarius. On her bridge were her watch officer (second officer) and helmsman. No lookout was posted. Her master went below at about 0230 and, although aware that other ships were in the area, did not return to the bridge until a few minutes before the collision. Hope's speed over the ground was about 10 or 11 knots. The radar was not used during the relevant period.

After entering the westbound lane of the Shiono Misaki TSS, Hope was overtaken by Maru. Shortly before 0310, the Hope's helmsman observed the red light of Aquarius off the starboard bow of Hope. At this time and thereafter, the watch officer was not using radar but was relying upon visual observation by himself and the helmsman. About five minutes later, that is about 0315, the Maru turned to cross Hope's bow. As the Maru crossed the course of the Hope, her watch officer ordered 10° left rudder, apparently to make sure of avoiding the stern of the Maru. He did not signal two blasts as required by Rule 28. Since the Maru was well over a half mile ahead of the Hope and since it only took about 10 seconds for the Maru to pass across the course of the Hope, the Hope's turn to the left was unnecessary. In any event, almost immediately after giving the order to turn to port, the Hope's watch officer ordered that the rudder be returned amidships. At this time he also summoned the master to the bridge.

When the master arrived at around 0317 or 0318, he observed that the Maru had completed its crossing of Hope. He also observed Aquarius off the starboard bow on a crossing collision course with Hope. Although it is not clear whether the Hope was in fact still swinging left from the influence of the earlier 10° turn, the master was apparently under the impression that she was. After making his observations, he ordered hard left rudder and the engines full astern and sounded three blasts to signify that his engines were backing. At 0321, Hope collided with the port side of Aquarius aft.

Hope suggests that one reason for turning to port was because of the presence of another vessel to starboard and on parallel course to Hope. Neither the Colorado, the Aquarius nor the Maru observed any vessel to starboard of Hope at any time; we are not prepared to find that there was any vessel to starboard of Hope which would have interfered in any way with a starboard turn by Hope. Even if a vessel were present to starboard, Hope could have, without being in violation of the International Rules,[4] taken action to slow down or stop or even make a right turn. *Publicover v. Alcoa S.S. Co.*, 168 F.2d 672, 677 (2d Cir. 1948); *The Holly Park*, 39 F.2d 572, 573 (2d Cir. 1930).

We turn now to the issue of liability. As to the Aquarius, she clearly was proceeding in the wrong direction in the westbound lane of the Shiono Misaki TSS. Her previous maneuvers to avoid a vessel which she overtook and passed before entering the TSS had placed her in a position from which, when she resumed her original course, she was headed directly into that lane. Hope contends that Aquarius' presence in the wrong lane was a major cause of the collision. Passing this question for the moment, it is clear that the applicable International Rules controlled once Aquarius had sighted Hope and Maru.

Shortly before entering the TSS, Aquarius sighted the lights of Hope, Maru

---

4. The International Regulations for Preventing Collisions at Sea ("International Rules") in effect at the time of the collision in 1973 were at 33 U.S.C. §§ 1051 to 1094 and in particular 33 U.S.C. §§ 1078, 1081, 1083–86, 1089–91. These sections are attached as Appendix B. (The Regulations, as revised in 1977, are now at 33 U.S.C. foll. § 1602.)

and Colorado off her port bow. Under Rule 19 (33 U.S.C. § 1081), these three vessels having the Aquarius on their starboard sides had a duty to keep out of the way of Aquarius. The privileged vessel was Aquarius, the others were burdened as to Aquarius. Significantly, the masters and officers on duty of each of the three ships here involved recognized that under these rules Aquarius was privileged and Hope and Maru were burdened. Under Rule 21 (33 U.S.C. § 1083) Aquarius was required to maintain her course and speed at least until collision with another could not be avoided. *Wilson v. Pacific Mail S.S. Co.*, 276 U.S. 454, 461–463, 48 S.Ct. 369, 370, 72 L.Ed. 651 (1928); *Maroceano Compania Naviera S.A. v. S.S. Verdi*, 438 F.2d 854, 857 (2d Cir. 1971). Pursuant to Rules 19, 21, 22 and 23, it was the duty of Hope and Maru to keep out of the way of the privileged vessel. Aquarius, keeping the approaching vessels under close observation, did maintain her course and speed until moments before the collision when she unsuccessfully took evasive action.

■ Maru, which was the only one of the three vessels observing the TSS[5], was not only burdened as to Aquarius, she was also burdened as to Hope so long as she was overtaking Hope. Under Rule 24, Maru had the duty of keeping out of the way of Hope while overtaking her to starboard, and with this duty (and also her duty under Rule 21 to keep her course and speed) she fully complied. As we have found above, Maru was relieved of this duty under Rule 24 when she was finally past and clear of Hope. Thus, Maru's turn to starboard at about 0315 to cross safely in front of Hope was not in violation of Rule 24 and was in full compliance with Maru's duties under Rules 19, 21 and 22 to keep out of the way of Aquarius.

Hope, as her watch officer and her master were aware, was burdened as to Aquarius. Under Rules 22 and 23, she was obli-gated to take affirmative action to keep out of the way. This she failed to do. Either before or after Maru crossed in front of her bow from left to right (at an angle, incidentally, which slanted well away from Hope's course), Hope had plenty of time and opportunity to turn to starboard, to slacken speed or to do both in order to avoid Aquarius. Instead, she held her course and speed (save for the brief 10° turn to port and almost immediate return to course while Maru was crossing) until moments before collision. Then, her master chose to turn sharply to port, when even a desperate turn to starboard might have avoided the danger.

■ Hope makes several contentions in an effort to shift the blame primarily to Aquarius and secondarily to Maru. As to Aquarius, Hope relies heavily upon the fact that Aquarius was in the wrong lane and contends that the evidence establishes a "custom" to use the TSS even though it had not been officially accepted. *Griffin, supra,* p. 572, states the rule on custom as follows:

. . . a definite custom or usage of navigation under particular circumstances or at a particular place, if not in conflict with law and if reasonable in itself, will be enforced by the courts . . . [citing case], but only upon clear proof of the existence of the custom and of the necessity for it . . . [citing cases].

None of the cases cited by *Griffin* support Hope's contention that the evidence here establishes a custom. Moreover, there is lacking here "clear proof of the existence of the custom and of the necessity for it". To illustrate this statement of the rule, *Griffin* at p. 572 quotes the following passage from *Mary Shaw,* 6 Fed. 918, 922 (1881):

The dangers arising from a departure from settled rules of navigation have led admiralty courts to hold that the local custom which is to justify such departure must be founded upon necessity arising from permanent local peculiarities, such

---

**5.** Aquarius was in the wrong lane and Hope intended to cut through the TSS. Colorado, which was in the separation zone, was also not observing the TSS.

as rocks, strong currents in crooked rivers, and the like, and that the exception should be as distinct and definite as the rule itself.

Here, there were no "local peculiarities" of the kind apparently envisaged by *Giffin* which would make necessary a custom in derogation of the International Rules. Accordingly, we are not prepared to find that there was a custom having any legal significance in this case; even if there were, the International Rules governed once the crossing situation developed. *See Lehigh C. & Navig. Co. v. Compagnie Generale Transatlantique*, 12 F.2d 337, 338 (2d Cir. 1926).

Hope also contends that Rule 19 was not applicable on the ground that it applies only when two vessels are involved; when more than two ships are present, Hope argues that Rules 27 and 29 come into play. Under the "special circumstances" language which appears in each of these Rules, Aquarius should have recognized, according to Hope, that Rule 19 was not applicable and that, since Aquarius was already at fault for being in the wrong lane of the TSS, it was up to her to take appropriate action, either by slowing or turning or both, to avoid the other ships. We think that Hope's argument is not meritorious. See generally *Griffin, The American Law of Collision* (1949) §§ 227, 228 at pp. 513–517.

The crossing rules are applied when more than two ships are present. *See Pacific-Atlantic S.S. Co. v. United States*, 175 F.2d 632 (4th Cir. 1949); *United States v. S.S. Malden, supra; The "F.J. Wolfe"*, 79 Lloyds L.R. 111 (C.A.1946). Rule 27 applies according to its terms only when "special circumstances" make departure from these Rules "*necessary* in order to avoid *immediate* danger" (emphasis supplied). *See Belden v. Chase, supra* 150 U.S. at 698–699, 14 S.Ct. at 271–272; *Moran Scow Corporation v. S.S. Boston*, 342 F.Supp. 216 (S.D.N.Y.1972); *Farwell's Rules of the Nautical Road*, 4th Ed. (1971), pp. 346–347, 354–355. As held in *The Mauch Chunk*, 154 F. 182, 187 (2d Cir. 1907), *cert. denied, Central Railroad Co. of*

*New Jersey v. Wren*, 207 U.S. 586, 28 S.Ct. 255, 52 L.Ed. 352 (1907), liability was found for keeping course and speed under the crossing rule only "after it was manifest that departure therefrom could alone prevent disaster". Here, Aquarius had observed Maru give way to avoid crossing Aquarius and had no reason to suppose Hope would not do the same. *See The Piankatank*, 87 F.2d 806, 810 (4th Cir. 1937). When it finally became apparent that Hope was not going to do the same and there was a clear need "to avoid immediate danger", Aquarius took action to change course and speed but without avail.

With respect to the Maru, Hope contends that her turn to starboard to pass across the course of Hope was in violation of Rules 24 and 22. But Maru, as we have found above (p. 195), was past and clear of Hope when she made the right turn, and was accordingly relieved of her duty under Rule 24 to keep clear of Hope. Hope also contends that Maru's action placed Hope *in extremis* which justified her successive turns to port. However, Maru's change of course at an angle of 45° took her not only across but diagonally away from the course of Hope. An *in extremis* situation plainly did not exist; if the Watch Officer of Hope erroneously thought one did, his poor judgment in making the initial turn to port (which set the stage for the Master's subsequent direction to turn to port after he belatedly arrived on the bridge) is no excuse and hardly makes the doctrine of *in extremis* applicable. *See Cuba Distilling Co. v. Grace Lines*, 143 F.2d 499 (2d Cir. 1944).

Nor was Hope placed *in extremis* by the navigation of *Aquarius*, which as we have indicated, properly adhered to the Rules. If an *in extremis* situation existed it resulted from the action of Hope, not from that of the other vessels. *See Griffin, supra*, pp. 533–535.

■ Hope was negligent in a number of other respects. No lookout was posted and the Watch Officer failed to keep an ade-

quate lookout. *In re Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704, 715–716 (S.D.N.Y.1977); *aff'd on opinion below* Dkt. Nos. 77–7256, 77–7278 (2d Cir. Nov. 16, 1977); see Rule 29. As a consequence, Hope did not become aware of the impending presence of Aquarius as soon as she could and should have. Moreover, unlike the Aquarius, Hope failed to use radar to check the position of the other vessels, and particularly their distance from Hope.

Hope also failed to sound the required two short blasts (Rule 28) when she turned to port 10°, which if given would have warned Aquarius that Hope was changing course and given Aquarius an opportunity to take appropriate action to avoid collision.

■ The absence of the Master from the bridge of Hope despite his knowledge that a number of ships were in the immediate area, until called by the Watch Officer to report the right turn of the Maru, was contrary to good seamanship. In light of the Watch Officer's inability to deal properly with the situation arising in front of him, the Master's absence may have been an important contributing factor.

■ Most significantly, Hope failed to either slow down or turn to starboard or both when such action was indicated. We are not persuaded, as indicated above, to accept Hope's contention that an unknown vessel was on the starboard side of Hope and in such a position that Hope could not turn right. Even if we were to accept Hope's contention, however, there was no reason why Hope could not have slowed or stopped to permit Aquarius, the privileged vessel, to cross safely. Finally, even after Hope had made the first turn to port and before the Master ordered hard left when collision was imminent, Hope had the time and the opportunity to avoid danger by turning to starboard. Indeed, had the Master been fully aware of the developing circumstances, such action might well have been taken by him after his arrival on the bridge. He testified that, before he went below at 0230,

he had expected the Maru ultimately to make a turn to starboard and cross in front of Hope. Later, when he returned to the bridge in response to the Watch Officer's call to report Maru's crossing action, he noticed that Maru had crossed and was already to starboard of Hope. Also, although the Watch Officer had ordered the helm back amidship after the first turn to port, when the Captain arrived about a minute later he was led to understand that the helm was still to port. At about that time, he became aware of the imminent danger of collision with Aquarius and at 0320 ordered hard aport and stop engines. He testified that, if called two minutes earlier, he could have avoided collision by going gradually to starboard and stopping.

We come, then, to Hope's contention that Aquarius must be held at fault for navigating in the wrong lane of the TSS. Counsel have not cited, nor has the Court's research disclosed, an American case in point. However, in *The Genimar*, [1977] 2 Lloyd's Rep. 17, an English admiralty court (Brandon, J.) condemned a vessel for navigating in the wrong direction in a lane of a traffic separation scheme, holding the vessel one-third at fault for the ensuing collision. Aquarius points out that the traffic scheme in the *Genimar* was approved by IMCO and printed on the relevant navigation charts, factors not present in the case at bar. Aquarius also relies on cases such as *The Bellhaven*, 72 F.2d 206 (2d Cir. 1934), in which Judge Learned Hand, exonerating a vessel navigating on the wrong side of a narrow channel, said:

> We have often held that if the offending vessel is visible by the other in time to shape her movement accordingly, and if she does not impede the other's navigation by her unlawful position, her fault has not contributed. *Id.* at 207–8.

These arguments are not persuasive. In the *Genimar*, the vessel in violation of the TSS was held in fault, notwithstanding the fact that, as a foreign vessel, the scheme was not compulsory as to her. The decision

of Mr. Justice Brandon, an experienced admiralty judge, rests rather upon the proposition that good seamanship required compliance by the vessel with a collision-preventing scheme of which her master had full knowledge. These circumstances are present in the case at bar, and the failure of the master of the Aquarius to conform with good seamanship, in the special circumstances of the case, gives rise to liability under Rule 29.

The master of Aquarius was well aware of the TSS, whether approved by IMCO or not, and consequently was aware of the likelihood of westbound traffic in the lane through which he directed Aquarius on her eastbound course.[6] It would have been an easy precaution for Aquarius to navigate further to the south, thereby avoiding the risk. In these circumstances, the words of Judge Hand, albeit spoken in a somewhat different context, are appropriate:

> It may seem a harsh rule that a man shall not recover for an admitted wrong, if he does not put himself to expense and trouble to fend against the threatened damage; yet when the inconvenience is trivial, this is the basis of those numberless cases which bar recovery when the sufferer has failed to protect himself after notice of danger. In the end the line must be found in the extent of the burden so imposed. If it be a question merely of turning one way or the other; he may not obstinately persist, and charge another for his injury. Grave dangers require easy precautions, even by those wronged. *In re Pennsylvania R. Co.*, 48 F.2d 559, 564 (2d Cir. 1931).

As to causation, an argument comparable to that of Aquarius was made and rejected in the *Genimar*. The English court ex-

pressed the view that, if only the two colliding vessels were navigating in the area, and the collision occurred in clear visibility, violation of the TSS by one of them might not be regarded as a "causative fault." [1977] 2 Lloyd's Rep. at 25–26. The situation is different, the court held, even in clear weather, when "the presence of several ships in the same vicinity may make navigation more difficult than when only two ships are involved, and it seems to me that this is also a risk which the scheme is intended to minimize." *Ibid.* In the *Genimar*, the court stated, there was "another ship about," whose presence "undoubtedly impinged on the navigation" of the vessel in violation of TSS, "and made the situation in which she found herself on encountering the Genimar more difficult than it would otherwise have been." *Ibid.* In thee circumstances, the English court concluded that the vessel's violation of the TSS was a contributing cause to the collision. That is the situation in the case at bar, Aquarius having the lights of three approaching vessels ahead of her (see p. 195, *ante*).

■ We therefore conclude that Aquarius must share a portion of the blame, not for any actions which she took or failed to take once she had entered the TSS, but solely for her failure to take the precaution of observing the TSS.

The greater portion of the blame quite clearly falls upon Hope. Under *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), we apportion responsibility for the collision 80% to Pacific Bulk Carriers, Inc., owner of Hope, and 20% to United States Lines, Inc., owner of Aquarius. The Clerk is directed to enter judgment.

SO ORDERED.

---

**6.** Although the TSS was apparently laid out on one of the charts available on the Aquarius, it had not been entered on the chart in use during the times here in question. However, the latter chart did include a track line which would have taken Aquarius into the eastbound lane.

## APPENDIX A

Fig. 5 潮岬沖

## APPENDIX B

*Material Sections of The International Rules of the Road from 33 U.S.C.*

### STEERING AND SAILING RULES

§ 1078.   *General considerations.*

1.  In obeying and construing sections 1078–1089 of this title, any action taken should be positive, in ample time, and with due regard to the observance of good seamanship.

2.  Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel.  If the bearing does not appreciably change, such risk should be deemed to exist.

\*     \*     \*     \*     \*     \*

4.  Sections 1079 to 1086 of this title apply only to vessels in sight of one another.

§ 1081.   *Power-driven vessels crossing (Rule 19).*

When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.

§ 1083.   *Vessels having right of way; duty in aiding to avert collision (Rule 21).*

Whereby any of [sections 1078–1089 of this title] one of two vessels is to keep out of the way, the other shall keep her course and speed.  When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision (see sections 1089 and 1091 of this title).

§ 1084.   *Positive action to keep out of way; crossing ahead of vessel having right of way (Rule 22).*

Every vessel which is directed by [sections 1078–1089 of this title] to keep out of the way of another vessel shall, so far as possible, take positive early action to comply with this obligation, and shall, if the circumstances of the case admit, avoid crossing ahead of the other.

§ 1085.   *Duty to slacken speed, stop or reverse (Rule 23).*

Every power-driven vessel which is directed by [sections 1078–1089 of this title] to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse.

§ 1086.   *Overtaking vessel to keep out of way (Rule 24).*

(a) Notwithstanding anything contained in [sections 1078–1089 of this title,] every vessel overtaking any other shall keep out of the way of the overtaken vessel.

(b) Every vessel coming up with another vessel from any direction more than 22½ degrees (2 points) abaft her beam, i. e., in such position, with reference to the vessel

which she is overtaking, that at night she would be unable to see either of that vessel's sidelights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of [sections 1078–1089 of this title,] or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

\*   \*   \*   \*   \*   \*

§ 1089. *Special circumstances requiring departure from rules to avoid immediate danger (Rule 27).*

In obeying and construing [sections 1078–1089 of this title] due regard shall be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from such sections necessary in order to avoid immediate danger.

## SOUND SIGNALS FOR VESSELS IN SIGHT OF ONE ANOTHER

§ 1090. *Sound signals indicating course (Rule 28).*

(a) *Meaning of blast.*

When vessels are in sight of one another, a power-driven vessel under way, in taking any course authorized or required by [sections 1061–1094 of this title], shall indicate that course by the following signals on her whistle, namely—

One short blast to mean "I am altering my course to starboard."

Two short blasts to mean "I am altering my course to port."

Three short blasts to mean "My engines are going astern."

(b) *Doubt as to action of another vessel.*

Whenever a power-driven vessel, which, under [sections 1061–1094 of this title], is to keep her course and speed, is in sight of another vessel and is in doubt whether sufficient action is being taken by the other vessel to avert collision, she may indicate such doubt by giving at least five short and rapid blasts on the whistle. The giving of such a signal shall not relieve a vessel of her obligations under sections 1089 and 1091 of this title or any other provision of [sections 1061–1094 of this title], or of her duty to indicate any action taken under [sections 1061–1094 of this title] by giving the appropriate sound signals laid down in this section.

## MISCELLANEOUS RULES

§ 1091. *Usual additional precautions required generally (Rule 29).*

Nothing in [sections 1061–1094 of this title] shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.