**JUNO s.r.l. and S/Y CHARLES JOURDAN, Plaintiffs,**

v.

**S/Y ENDEAVOUR her engines, tackle, etc., and Endeavour, Inc., Defendants.**

Civ. No. 93–265–P–C.

United States District Court, D. Maine.

Sept. 27, 1994.

Michael X. Savasuk, Portland, ME, Jeremy J.O. Harwood, Healy & Baillie, New York City, for plaintiffs.

William H. Welte, Welte & Welte, P.A., Camden, ME, Lars Forsberg, Bradford D. Conover, Dickerson & Reilly, New York City, for defendants.

### MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

Plaintiff brought this action seeking damages arising out of an accident between the sailing yacht CHARLES JOURDAN and the sailing yacht ENDEAVOUR. In a two-count complaint, CHARLES JOURDAN sought both the cost of repairs to the yacht and compensation for loss of income. Endeavour, Inc. filed two counterclaims alleging loss of income due to wrongful arrest and compensation due to loss of income which arose

from ENDEAVOUR foregoing charters in the Mediterranean in 1993.

After a bench trial, this Court finds that both sailing vessels were at fault in the accident, that CHARLES JOURDAN's fault was sixty percent (60%), and ENDEAVOUR's fault was forty percent (40%). The Court will award costs for certain repairs and disallow others. For the reasons that follow, the Court also finds that neither party proved its claim of loss of charter and sponsorship income and that no evidence to support the ENDEAVOUR's wrongful arrest claim was submitted. These conclusions are based on the following findings of fact and discussion of the applicable law.

### STATEMENT OF FACTS

In the fall of 1992, the sailing yacht CHARLES JOURDAN and the sailing yacht ENDEAVOUR were both participating in the La Nioulargue Regatta which includes a series of sailing races in and around the Bay of Saint Tropez. The CHARLES JOURDAN is a "maxi-yacht" racing boat of an ultra-light displacement design measuring approximately 72 feet in length. The ENDEAVOUR is a restored, classic, high-aspect-rig yacht of the "J" class of approximately 120 feet in length.

On the afternoon of October 3, 1992, the CHARLES JOURDAN racing in a maxi-yacht race, had rounded the Rabiou Buoy near the Rabiou Tower, and was heading into Saint Tropez Bay past mark A to the finishing line at Bouillabaisse Buoy, in the direction of Port Grimaud, when it encountered the ENDEAVOUR. The ENDEAVOUR was in a race for classic yachts which had begun in Cannes and was to end at mark A in Saint Tropez Bay—the same mark CHARLES JOURDAN and the maxi-yachts had to pass in their race.

The CHARLES JOURDAN rounded the Rabiou Buoy and began a heading to pass marker A (leaving it to port) and towards the Bouillabaisse Buoy. At that time, the CHARLES JOURDAN was in a heated contest with another maxi-yacht, LA POSTE, which was on the same tack and in close proximity leeward of the CHARLES JOURDAN. The CHARLES JOURDAN was able to gain a lead on LA POSTE, but the two maxi-yachts remained overlapped as they headed on a course that would give marker A a wide berth to port, and continued to the finish line. With LA POSTE in its position immediately to leeward and slightly astern of the CHARLES JOURDAN, the CHARLES JOURDAN did not have the right to bear off to leeward. International Yacht Racing Rules ("IYRR"), Rule 37.1. The CHARLES JOURDAN and LA POSTE were racing at approximately 11 knots.

The ENDEAVOUR was travelling at a speed of approximately 7 knots on a broad reach to windward of the CHARLES JOURDAN and LA POSTE as its crew observed the contest between the two maxi-yachts. Although participating in a race, ENDEAVOUR was not flying a racing flag. She was so far ahead of the other classic yachts in her race that none of her competitors was in sight. Her crew was relaxed and her tack remained unchanged as she travelled the last stretch of the race unchallenged. The angle of the ENDEAVOUR's approach was approximately 40 degrees different from that of CHARLES JOURDAN and LA POSTE. As it entered the area of the collision, the ENDEAVOUR's preventer was in place, keeping the yacht's boom at its maximum extension approximately 60 degrees from the center line of the boat.[1]

The ENDEAVOUR, the CHARLES JOURDAN, and LA POSTE were on converging courses as they approached buoy A. Although the courses were converging, this Court finds that the CHARLES JOURDAN was more than 22.5 degrees abaft the beam of the ENDEAVOUR until near the time of overlap and that the CHARLES JOURDAN was moving faster than the ENDEAVOUR. Under these circumstances, the International Regulations for Prevention of Collisions at Sea, 1972, 33 U.S.C. §§ 1601–1608, 33 C.F.R. pt. 81, App. A (hereafter "COLREGS"), consider boats to be in an overtaking, not cross-

---

1. No effort was made by ENDEAVOUR's crew as the boats approached each other to "free up" the preventer so that her boom, the part of her which ultimately struck CHARLES JOURDAN, could be sheeted in to reduce its overboard extension.

ing, situation, with the CHARLES JOURDAN as the give-way vessel. COLREGS, Rule 13. The CHARLES JOURDAN was not permitted to fall off to leeward under the racing rules without risking disqualification. LA POSTE held its course, perhaps with the intention of forcing the CHARLES JOURDAN into ENDEAVOUR's wind shadow and gaining an advantage in the race. The ENDEAVOUR held its course, observing the race and believing that the smaller boats would maneuver to avoid the ENDEAVOUR since its wind shadow could have a devastating effect on their forward progress. The crew members of the CHARLES JOURDAN gestured desperately at the ENDEAVOUR to stay clear. The ENDEAVOUR's crew gestured back but did not change course or sheet up her main sail. Moments before the maxi-boats entered ENDEAVOUR's wind shadow, LA POSTE bore off to leeward, freeing CHARLES JOURDAN to fall off to avoid collision with ENDEAVOUR. Despite this option and ample opportunity to "harden up" and pass safely astern of ENDEAVOUR, the CHARLES JOURDAN held its course and entered the ENDEAVOUR's wind shadow. Because of its ultra-light weight displacement design, the CHARLES JOURDAN immediately lost forward momentum, its speed falling from 11 knots per hour to about 3 knots. At this rate, the ENDEAVOUR began closing the distance rapidly and bearing down on the CHARLES JOURDAN. CHARLES JOURDAN then attempted to bear off to leeward but, because it had lost momentum, was unable to escape the ENDEAVOUR's wind shadow. The ENDEAVOUR's captain began turning the larger yacht to windward in a last-second attempt to avoid the CHARLES JOURDAN, but because of the yacht's weight, size, and keel design, the boat's tack did not change to any significant degree before the ENDEAVOUR's boom caught the backstays of the CHARLES JOURDAN which were ripped from the boat, causing damage to the mast and rigging. The CHARLES JOURDAN was jerked to leeward because of this contact, and the ENDEAVOUR passed on to finish its race and to dock in Saint Tropez.

The CHARLES JOURDAN and the ENDEAVOUR had been assigned adjoining spots at the dock and when CHARLES JOURDAN limped into its place, angry words were exchanged between the crews of the boats. Captain Peter Moran of the ENDEAVOUR threatened to protest the CHARLES JOURDAN. Alessandro Buzzi, the captain of the CHARLES JOURDAN, enraged by the ENDEAVOUR's conduct and the threat of a protest, shouted angry words of one sort or another. At worst, reports of his comments are that he said that Moran had killed his boat so he would kill Moran. Buzzi filed a protest with the international race jury and prevailed against the ENDEAVOUR under Racing Rule 37.1, which gives right-of-way to leeward vessels in an overlap.

Thereafter, the CHARLES JOURDAN was taken to the Antibes, where the damage to the boat was surveyed and the cost of repairs was estimated. The surveyor determined that the stress on the mast and rigging from the incident required replacement of both the mast and the rigging. The repairs were not made until early 1993 because Buzzi believed that the ENDEAVOUR's insurance company would cover the costs and was awaiting payment from it. During this time, Buzzi turned down a sponsorship for another race allegedly because he could not be sure that the boat would be ready in time for the race.

Meanwhile, the ENDEAVOUR's owner and charter agent made the decision not to spend the profitable summer charter season in the Mediterranean allegedly for fear that they might run into the CHARLES JOURDAN or some member of its crew and that another incident might occur. They opted to spend the summer season chartering in New England, which plan was disrupted by delays in a shipyard in which ENDEAVOUR underwent a refit. They also decided to cancel plans to have the ENDEAVOUR receive its 5,000-mile overhaul in the Mediterranean and made an appointment to have the work done in Rhode Island in the early spring of 1993. In the end, the ENDEAVOUR did not charter until about September of 1993. Shortly thereafter the boat was arrested off the coast of Maine and this action was begun.

No evidence regarding the propriety of this arrest was offered at trial.

## DISCUSSION

### 1. *Liability*

██ There is no dispute that the COLREGS provide the rules which govern the behavior of these particular boats.[2] Although they were both involved in races which were governed by the IYRR, the rules of a private racing organization do not and cannot preempt the application of the COLREGS which have been adopted by treaty to govern worldwide.[3] Thus, we look to the COLREGS for the controlling rules in this case.

██ Having concluded that the situation which led to this accident was an overtaking situation, the Court is satisfied that CHARLES JOURDAN failed to stay clear of the ENDEAVOUR as required by Rule 13 of the COLREGS. The CHARLES JOURDAN held its course until the risk of a collision was significant and, accordingly, is at fault in this situation. Although avoiding this risk of collision would have hazarded the forfeiture of the race by CHARLES JOUR-

DAN (either by attempting to fall off to leeward, which might have resulted in disqualification, or by turning upwind earlier and passing the ENDEAVOUR by its stern and to windward, which would have meant losing significant time), no departure from the stricture of the COLREGS is permitted for a vessel for the sole purpose of remaining in a race.[4] There was significant testimony that ENDEAVOUR did not appear to be racing. The Court finds credible the testimony that the captain and tactician of the CHARLES JOURDAN did not think the ENDEAVOUR was prepared to spring into action but that it seemed to be on "autopilot." Nevertheless, they permitted a situation to develop which the skipper on each boat had a duty to avoid. Under the COLREGS, the CHARLES JOURDAN, as an overtaking vessel, had the duty to stay clear of the ENDEAVOUR even if this meant losing or being disqualified from its race.

██ CHARLES JOURDAN's fault in this incident does not lead to the conclusion that it is the only vessel at fault. Under the "*Pennsylvania* Rule," failure to abide by the COLREGS creates a presumption of fault.[5] Here, however, we are satisfied that, al-

---

**2.** The COLREGS provide:
 Rule 1. Application
 (a) These Rules shall apply to all vessels upon the high seas and in all waters connected therewith navigable by seagoing vessels.
 33 U.S.C.A. foll. § 1602, Rule 1; 33 C.F.R. pt. 81, App. A, Rule 1.

**3.** The statute provides for "special rules" made by appropriate government authorities and further requires that such rules "conform as closely as possible to [the COLREGS]." 33 U.S.C.A. foll. § 1602, Rule 1(b); 33 C.F.R. Pt. 81, App. A, Rule 1. There is no provision allowing a private organization's rules to preempt the COLREGS.

**4.** The United States Supreme Court has held:
 Obviously, [the Rules of Navigation] must be rigorously enforced in order to attain the object for which they were framed, which could not be secured if the masters of vessels were permitted to indulge their discretion in respect of obeying or departing from them. Nevertheless, it is true that there may be extreme cases where departure from their requirements is rendered necessary to avoid impending peril, *but only to the extent that such danger demands*.
 *Belden v. Chase*, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (1893) (emphasis added).

**5.** The Supreme Court established a presumption of negligence for violation of navigational regulations in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873):

> The liability for damages is upon the ship or ships whose fault caused the injury. But when ... a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*Id.* at 136, 22 L.Ed. 148. The Court of Appeals for the First Circuit followed this approach recently in *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 436 (1st Cir.1992), where the court emphasized that the "*Pennsylvania* Rule" does not establish fault but "serves solely to shift the burden of proof on the issue of causation once a claimant has established that a vessel has violated a statute or regulation." *Id.*

though the CHARLES JOURDAN violated the COLREGS, the ENDEAVOUR acted unreasonably and was, by judgmental neglect, unprepared and ultimately unable at the critical moment to meet the situation effectively and avoid the collision. The COLREGS general rule of good seamanship requires navigators to consider all available information to avoid the risk of accident. COLREGS, Rule 8. Here, the ENDEAVOUR was aware that the CHARLES JOURDAN was racing and that the racing rules prevented the CHARLES JOURDAN from bearing off to leeward without forfeiting the race. The CHARLES JOURDAN, in contrast, had no reason to conclude until seconds before the collision that the ENDEAVOUR was not simply another spectator boat. The ENDEAVOUR was not flying a racing flag, and it was not clearly racing. The ENDEAVOUR crew was undoubtedly aware that racing boats often disregard spectator boats, assuming that they will stay clear. Although Moran did shout "we're racing too" to the CHARLES JOURDAN, the boats were already in dangerous proximity when that occurred.

The ENDEAVOUR, rather than simply watching the heated match and bearing down on the other two boats, had a duty to be prepared to react and to do so in ample time to avoid collision. The undisputed testimony was that she failed to attempt to change course until it was far too late for the massive yacht to respond to her wheel in a timely manner and avoid collision. Furthermore, the preventer was on and remained on although it was clear that the ENDEAVOUR would soon be in close proximity to other boats and should be prepared to maneuver and change tacks.

Under the circumstances presented here, the assumption that all other boats would stay clear was unreasonable and the ENDEAVOUR's failure to take action when it observed the CHARLES JOURDAN cling to its collision course was a significant cause of the accident. The Court is convinced that a prudent seaman at the helm of ENDEAVOUR, under the circumstances, and with so little at stake for her vessel's position in its own race, would have taken more timely action to stay out of the way of two oncoming racing boats in fierce competition. The crew of CHARLES JOURDAN could reasonably presume that the ENDEAVOUR was being skippered by someone who knew and understood the racing rules and good seamanship. Accordingly, the Court finds that the ENDEAVOUR is forty percent (40%) at fault for failing to be prepared to maneuver prudently when entering a situation in which the danger of collision became progressively more ominous and for failing to react in ample time when it became clear that a collision was likely as the vessels continued on their respective courses.

### 2. *Damages*

 As to the loss of charter income and sponsorship income, the Court is satisfied that each party made its own choices and caused its own loss of income for reasons of its own respective interests which had nothing to do with the accident or its *sequelae*. Repairs on the CHARLES JOURDAN did not need to await insurance payments but could have been done on credit. Accordingly, the loss of sponsorship in the spring of 1993 was self-inflicted. Similarly, the Court does not find that any threat sufficient to justify the ENDEAVOUR's departure from the Mediterranean is demonstrated by the evidence, credibly read. The ENDEAVOUR remained in the Mediterranean for several weeks after the incident. The threats were never repeated after October 3, 1992. Moreover, the threats were uttered in anger and were far too vague to justify the decision to leave the Mediterranean. Furthermore, there is no testimony or evidence from which to make, with reasonable certainty, a determination as to what amount of income would have been earned had the ENDEAVOUR chartered in New England, as planned, during the summer. The Defendants have failed to demonstrate any damages by specific and credible evidence.

 As to the cost of repair to the CHARLES JOURDAN, the Court finds the testimony of Ron Love particularly credible and persuasive and is satisfied that in substantial part the repairs ultimately made were not necessary. The Court finds that the damage caused by the incident required

the replacement of the permanent backstay and luff track of CHARLES JOURDAN. These repairs would reasonably have cost a maximum of Ten Thousand Dollars ($10,000). The ENDEAVOUR, being forty percent (40%) at fault, is subject to entry of judgment of Four Thousand Dollars ($4,000), and it is hereby *ORDERED* that judgment enter accordingly.

So *ORDERED*.